R. M. EDWARDS and Dorothy Edwards, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Loyd W. DISLER and Joy Disler, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 44-68—45-68.

United States Court of Appeals Tenth Circuit.

Sept. 17, 1969.

Rehearings Denied Oct. 20, 1969.

Holloway, Circuit Judge, dissented.

William A. Goffe, Tulsa, Okl. (Donald P. Moyers, Tulsa, Okl., was with him on the brief), for petitioners.

Michael B. Arkin, Dept. of Justice, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Robert N. Anderson, Dept. of Justice, Washington, D. C., were with him on the brief) for respondent.

Before MURRAH, Chief Judge, and LEWIS and HOLLOWAY, Circuit Judges.

LEWIS, Circuit Judge.

This joint petition brought by tax-payers[1] pursuant to 26 U.S.C. § 7482 seeks review of a decision of the Tax Court of the United States, 50 T.C. 220, wherein that court, with five judges dissenting, determined that certain income received by petitioning taxpayers during the years 1962, 1963, and 1964 should be taxed as ordinary dividend income pursuant to 26 U.S.C. §§ 301 and 316, rather than as capital gains within the purview of 26 U.S.C. § 1232. A deficiency in the sum of $21,058.24 was assessed against petitioners Edwards and the sum of $19,821.00 against petitioners Disler. The evidentiary background facts of the transaction premising the controversy are detailed in the opinions of the Tax Court, but the determinative issue on review may be brought into focus by summary.

In 1958, Edwards and Disler organized the Disler Engineering Corporation (Disler) for the purpose of manufacturing and selling heat exchangers. Disler operated on leased land in Sand Springs, Oklahoma, and prospered greatly. Gross sales increased from $72,000 in 1958 to $1,266,212.85 in 1962. Since the location of Disler was inadequate to allow expansion, the company in 1961 began looking for a new location.

Another company, Birmingham Steel & Supply. Inc. (Birmingham) was also located on leased land in Sand Springs. This company was wholly owned by Ovid Birmingham and was engaged in the fabrication of structural steel including parts for heat exchangers. Birmingham Steel was not then prospering and had incurred substantial losses in 1959, 1960, and 1961, although in prior years the company had enjoyed continued success. At the invitation of one Stainer, attorney for and secretary of Birmingham, Disler was invited to inspect the Birmingham property as a prospective purchaser.

1. R. M. Edwards, Dorothy Edwards, Loyd W. Disler and Joy Disler. Dorothy Edwards and Joy Disler were made parties to this action solely by virtue of their filing joint income tax returns for the years in issue.

On June 12, 1962, Edwards and Disler did inspect the Birmingham property and upon Stainer's inquiry as to what the "whole place" was worth Edwards replied that he would appraise it at $75,000. At that time Edwards knew nothing of the financial condition of Birmingham. Two days later Stainer advised Edwards that the "offer" was accepted. Edwards responded that his appraisal of the physical facilities was not intended as an offer but that he would consider making a firm offer after he was given an opportunity to examine the Birmingham corporate records including the balance sheet. Thereafter, Birmingham furnished the following abbreviated financial statement:

### ESTIMATED CONDITION OF BIRMINGHAM STEEL & SUPPLY, INC. SUBJECT TO AUDIT

| LIABILITIES: | |
|---|---|
| Vouchers Payable | $65,526.00 |
| Accrued Payroll | 6,712.44 |
| Accrued Withholding & Social Security T4 | 2,661.17 |
| Chattel Mortgage on Machinery & Equipment | 581.99 |
| Notes Payable—National Bank of Tulsa— | |
| secured by accounts receivable | 20,417.58 |
| **TOTAL LIABILITIES** | **$95,899.18** |

| ASSETS: | |
|---|---|
| Current Assets: | |
| Cash | $ 3,923.93 |
| Accounts Receivable Less Reserve for Bad Debts | 37,727.75 |
| Inventory | 110,000.00 |
| **TOTAL CURRENT ASSETS** | **$151,651.68** |
| Fixed Assets: | |
| Machinery, equipment, Tools, Furniture, Fixtures, etc.—Book Value Dec. 31, 1961 | 93,041.30 |
| **TOTAL ASSETS** | **244,692.98** |

After considering this financial statement, taxpayers concluded that they would be willing to pay $75,000 for all the Birmingham stock and letters of intent were prepared stating:

This letter will confirm our offer to purchase from you all of the outstanding stock issued by Birmingham Steel & Supply, Inc., an Oklahoma corporation, for the purchase price of $75,-000.00, and this letter may be used as a letter of intent for said purchase. It is understood and agreed, however, that this purchase is subject to the approximate correctness of an estimated financial statement of said Corporation which was issued by you, said statement listing total liabilities in the approximate amount of $95,899.18, total current assets in the approximate amount of $151,651.68, and total fixed assets in the approximate amount of $93,041.30, and further realizing there might be a slight difference, either plus or minus, to said accounts.

After preparation of the letter of intent but before execution, a Disler accountant discovered that the Birming-

ham financial statement did not reflect six outstanding promissory notes payable to Ovid Birmingham in the total amount of $241,904.82. The letters of intent were then amended by adding a handwritten final sentence providing for the assignment of the notes to taxpayers and, as amended, were executed. Thereafter a formal contract of purchase was executed by the parties wherein the purchase price of $75,000 was allocated, $5,000 to the stock of Birmingham Steel and $70,000 to the Ovid Birmingham notes. The contract was prepared by Stainer, the Birmingham attorney.[2]

After taking over Birmingham, taxpayers continued to operate that company as a separate entity and without any addition to capital soon turned what had been an unprofitable enterprise back into a money-making venture. Beginning in 1962, earnings from Birmingham were paid to taxpayers to be applied on the notes. Edwards and Disler each received $10,952.41 in 1962; $50,000 in 1963; $15,000 in 1964; and by 1966 the notes were paid in full. For tax purposes, taxpayers treated such payments as first a return of capital and thereafter as long-term capital gains. The Commissioner classified the payments as the equivalent of dividends taxable as ordinary income and this controversy was thus born.

The initial issue that was presented to the Tax Court was whether the subject notes when held by Ovid Birmingham constituted a valid corporate indebtedness of the Birmingham company to him. The Tax Court determined that the notes did constitute a valid and bona fide corporate debt, and that determination is not now disputed by the Commissioner. The Tax Court further determined that the "promissory notes in issue constituted valid indebtedness of Birmingham Steel in the hands of Ovid Birmingham but did not retain such character when purchased by petitioners." Although this determination is labeled as an "ultimate finding of fact," it obviously is a result reached by legal reasoning springing from evidentiary facts and the inferences to be drawn therefrom. As in Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 where the determinative issue involved gift or income, "primary weight in this area must be given to the conclusions of the trier of fact.

2. Pertinent parts of the contract provided:

WHEREAS, Seller is the owner of all of the outstanding shares of stock issued by Birmingham Steel & Supply, Inc., an Oklahoma corporation, and Promissory Notes executed by Birmingham Steel & Supply, Inc. to Seller, and whereas, Seller desires to sell said shares of stock in said Corporation and said Promissory Notes executed by said Corporation to the Seller, and whereas Purchaser desires to purchase said shares of stock and said Promissory Notes.

NOW, therefore, in consideration of the covenants and agreements hereinafter set forth, it is mutually agreed between the parties thereto as follows:

1. Seller agrees to sell to Purchaser all of the outstanding shares of stock issued by Birmingham Steel & Supply, Inc., an Oklahoma corporation, the same being four thousand one hundred two (4,102) shares of common stock, said shares being issued by Certificates Number One (1) through Twenty-four (24) inclusive, and all of the Promissory Notes executed by Birmingham Steel & Supply, Inc. to Seller, said Notes to be indorsed without recourse; that the consideration to be received by the Seller from the Purchaser for said shares of stock and said Promissory Notes shall be as follows: Five Thousand Dollars ($5,000.00) for all of the shares of stock issued by Birmingham Steel & Supply, Inc., and Seventy Thousand Dollars ($70,000.00) for all of the Promissory Notes executed by Birmingham Steel & Supply, Inc., to Seller, said Notes to be indorsed without recourse; that the consideration shall be paid by the Purchaser to the Seller as follows: * * *.

2. Purchaser agrees to pay Seller the amount of Five Thousand Dollars ($5,000.00) for the outstanding shares of stock issued by Birmingham Steel & Supply, Inc., and Seventy Thousand Dollars ($70,000.00) for all of the Promissory Notes executed by Birmingham Steel & Supply, Inc., to Seller, said Notes to be indorsed over to Purchaser by Seller without recourse * * *.

* * * " [3] This we do and also accept the basic facts from which the legal reasoning of the majority opinion of the Tax Court springs to the conclusion that the subject notes, for tax purposes, immediately changed nature when acquired by taxpayers from a genuine corporate indebtedness to a contribution to capital. The heart of the majority opinion is premised on the continuing consideration of $75,000 present throughout the negotiations and the initial and continuing desire of taxpayers to obtain the physical assets of Birmingham. All other circumstances of the transaction are set aside as pure form and it is said to "hold otherwise would be to exalt form over substance." We disagree and believe the decision of the Tax Court clearly exalts a legal fiction over both the form and substance of the parties' transaction.

It is of course true that the contractual form of a transaction cannot control the imposition of tax liability when the realities of the transaction show that form does not represent a bona fide and actual agreement. But it is equally true that the form of a contract is the considered and chosen method of expressing the substance of contractual agreements between parties and the dignity of contractual right cannot be judicially set aside simply because a tax benefit results either by design or accident. Form, absent exceptional circumstances, reflects substance. We do not find present in this case any of the traditional exceptional circumstances that justify the piercing of form to impose an exceptional tax liability. This is not a "thin capitalization" case as in Jewell Ridge Coal Corp. v. Commissioner, 4 Cir., 318 F.2d 695. After acquisition, Birmingham was operated on its original capital and the sufficiency of that capital, aided by competent management, restored to the profit column what had once been a successful company.[4] Nor is this a case such as Covey Investment Co. v. United States, 10 Cir., 377 F.2d 403, where long overdue notes were never treated as recognizable indebtedness. In the instant case, repayment followed the corporate ability to repay. Neither the fact that the combined contract value attributed to the stock and notes equaled the original value assigned by taxpayers to the stock alone, nor the fact that the principal purpose of the contract, as far as taxpayers were concerned was to procure needed physical assets supports the court's inference that irrespective of the contract provisions to the contrary, the notes had no independent significance.[5] The significance of the notes to taxpayers is borne out by the court's ruling that the notes in the hands of Ovid Birmingham constituted a valid outstanding corporate indebtedness. Had Mr. Birmingham retained the notes for himself or assigned them to some third person, he or that third person could have "forced" the corporation to honor the indebtedness to the personal monetary detriment of taxpayers as controlling shareholders of the Disler Company. Certain it is that the value of the stock to taxpayers was materially affected by the discovery of this large outstanding debt and that they were entitled to take this debt into account when contracting for the purchase of the corporate stock.[6]

3. 363 U.S. at 289, 80 S.Ct. at 1199 (footnote omitted).

4. The distinction between *Jewell* and the case at bar is distinguished both factually and legally in the dissenting opinion of Judge Featherston. *See* 50 T.C. 220 at 232–233. We agree with his analysis.

5. Although rejecting the majority view that the notes constituted a contribution to capital, Judge Withey concurred in the result in the Tax Court on the theory that no investment consideration was paid by taxpayers for the notes. *See id.* at 230. We think this approach is also negatived by the total circumstances of the transaction.

6. Even though the purchase of the stock did enable taxpayers to achieve their principal objective in obtaining assets admittedly needed for expansion of their controlled corporation, the transaction cannot be classified as a mere purchase of corporate assets. The fact that upon obtaining the corporate stock taxpayers did not liquidate the corporation in

This is exactly what they did when, after learning of the existence of the notes, they procured an agreement to assign the notes and when they signed the contract which allocated the purchase price between the stock and the notes. The fact that in this admitted arms-length transaction the combined purchase price of the notes and stock, either by chance or by design, happens to be identical to that originally offered for the corporate facilities, and later for the stock of the corporation, in no way negates the importance of the notes in the hands of taxpayers. Rather it is safe to assume that if a satisfactory arrangement respecting the notes had not been worked out, taxpayers would have rescinded, and justifiably so, their offer to buy the stock. The notes representing a corporate indebtedness of over $241,000 constituted a liability that taxpayers could ill afford to ignore and the assignment of the notes, as opposed to their cancellation, was the means chosen by the contracting parties to deal with said factor. Both buyer Edwards and seller Ovid Birmingham testified that the negotiations centered around the assignment of the notes and that there was never any discussion about the cancellation thereof.

When applicable statutory laws do not prevent a shareholder of a given corporation from also becoming a creditor of that corporation and where the transaction creating the debtor-creditor relationship is not a sham or subterfuge, the terms of the transaction must be honored by the court. J. S. Biritz Const. Co. v. Commissioner, 8 Cir., 387 F.2d 451; Nassau Lens Co. v. Commissioner, 2 Cir., 308 F.2d 39. There is no evidence of a sham or subterfuge in the subject case. Rather taxpayers as the dissent below states "merely took the capital financial structure as they found it";

and the fact that the nature of the transaction enables appellants to take advantage of the favorable provision of § 1232 is not by itself sufficient cause to disregard the form of the transaction. Nassau Lens, *supra.* The totality of the circumstances leading to the execution of the subject contract allows no different inferences to be drawn as to the substance of the transaction than if the parties had arrived at their final agreement in the orthodox method of offer and acceptance after full disclosure and knowledge of the financial structure of Birmingham. Had the latter procedure occurred, we can conceive of no reason to permissibly infer that form did not reflect substance. Taxpayers not only took the financial structure of Birmingham as they found it but they proceeded to operate it as they found it, albeit more competently, and paid its debts as they found them.

The petition to review is granted and the decision of the Tax Court is reversed.

HOLLOWAY, Circuit Judge (dissenting):

I respectfully dissent. To me the decision of the Tax Court is based, as it states, on an ultimate finding of fact. The finding was that although the notes constituted valid outstanding indebtedness in the hands of Mr. Birmingham, they " * * * did not retain such character when purchased by petitioners." 50 T.C. at 226. The question whether the transaction resulted in the notes' representing equity investment or corporate debt is one " * * * leading to findings of ultimate fact." Covey Investment Co. v. United States, 377 F. 2d 403 (10th Cir. 1967); see also McSorley's, Inc. v. United States, 323 F.2d 900 (10th Cir. 1963); Diamond Bros. Co. v. Commissioner, 322 F.2d 725 (3d

order to reach the corporate assets, but rather kept it alive as a separate and distinct corporation, clearly distinguishes the subject case from Kimbell-Diamond Milling Co. v. Commissioner, 5 Cir., 187 F.2d 718, cert. denied, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626, and cases related to it. In this regard, it is important to

note that Ovid Birmingham testified he would have been willing to sell the assets independent of the company's stock, which shows that if taxpayers' interest, as finalized, was in fact limited to the corporate assets, they could have accomplished this purpose without also purchasing the stock.

584

Cir. 1963); and Jewell Ridge Coal Corp. v. Commissioner, 318 F.2d 695 (4th Cir. 1963).

The majority opinion and that of the Tax Court state the facts in detail. The Tax Court found that the notes constituted bona fide debt in the hands of Mr. Birmingham. However, the petitioners set out to invest $75,000 to obtain the property. This was attempted by an offer in that amount for the stock alone after some examination of the books. As first drawn the letter of intent showed that the petitioners did not then contemplate obtaining assignment of the notes, whose existence was unknown. And the entire purchase price—which remained the same in the final agreement—was only a portion of the face amount of the notes. While the majority opinion here persuasively points to facts supporting its view, the ultimate finding of fact by the Tax Court on the entire record was not clearly erroneous. To me the case is one that does turn on a fact question and one where we cannot say that the Tax Court finding was clearly erroneous. In such circumstances the finding is binding. 26 U.S.C.A. § 7482(a); Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). For these reasons I would not disturb the decision of the Tax Court.