427 F.2d 1334
 70-2 USTC P 9477
 IMPERIAL CAR DISTRIBUTORS, INC., Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE.
Frederic ROYSTON and Toby L. Royston, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE.
IMPERIAL CAR DISTRIBUTORS, INC., Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE.
 Nos. 18083-18085.
 United States Court of Appeals, Third Circuit.
 Argued April 9, 1970.
Decided June 23, 1970.
 
 Clement J. Clarke, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellants.
 Thomas L. Stapleton, Dept. of Justice, Tax Division, Washington, D.C., for appellee.
 Before SEITZ and ALDISERT, Circuit Judges and LATCHUM, District judge.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 Appellants here are the corporate taxpayer, Imperial Car Distributors, Inc., and its stockholder-taxpayers, Frederic and Toby Royston. At issue is the tax treatment of monies received by the Roystons as noteholders from Imperial. Appellants content that these payments were in satisfaction of corporated indebtedness and thus reportable as capital gains to the noteholders under Section 1232(a)(1) of the Internal Revenue Code of 1954. The corporation seeks the corollary right of interest deductions from the amount of interest paid on the notes. Adopting the position of the Commissioner of Internal Revenue, and relying on its prior decision in Edwards v. Commissioner of Internal Revenue, 50 T.C. 220 (1959) which was subsequently reversed at 415 F.2d 578 (10 Cir. 1969), the Tax Court ruled that the payments were corporate dividends, taxable as ordinary income with no interest deductions allowable to the corporation.[1]
 
 
 2
 In 1953, Hambro Automotive Corporation, the national distributor for British Motor Car Corporation products in the United States, acquired the outstanding stock of Imperial Car Distributors from the estate of its incorporator, J. D. Allen. Included in the transaction was the transfer of Imperial's franchise to sell British Motor Cars in a four-state area and Allen's regional franchise for M.G. sportscars.
 
 
 3
 Hambro's operation of Imperial was less than spectacular, resulting in a loss of over $48,000 in 1954 and taxable income of only $1,277 in 1955. With liabilities mounting, Imperial's directors voted to liquidate and dissolve the corporation in November, 1955. These plans had not been finally effected when in June, 1957, a group of four investors-- including appellant Frederic Royston-- negotiated the purchase of Imperial from Hambro, for the admitted purpose of acquiring the American franchise rights owned by Imperial. At this point, Imperial's operations had resulted in unpaid obligations to Hambro for automobile purchases in excess of $115,000. These amounts had been converted to interest-bearing notes totalling over $129,000 and payable to Hambro.
 
 
 4
 In their contract of acquisition, the investors agreed to pay Hambro $2,000 for Imperialhs capital stock and an additional $2,000 for Hambro's assignment of its Imperial notes. New notes were then issued by Imperial in proportionate amounts to each of the four investors. Also included as consideration for this second $2,000 was Hambro's assignment of approximately $3,600 in Imperial's accounts receivable. A final $150 was paid for the three issued and outstanding shares of Imperial stock with each investor receiving a three-fourths share.
 
 
 5
 Following the investor's acquisition, Imperial's financial picture brightened considerably, so much so that in the year following acquisition Imperial had taxable income of almost $80,000.[2] This amount was increased to almost $200,000 in 1959. As a result of these increased revenues and profits, Imperial began to retire the notes held by the investors, seeking to deduct the interest payments on the notes from its taxable income. As noteholders, the Roystons sought to claim the payments as capital gains. As previously noted, the Commissioner disallowed such tax treatment and was upheld by the Tax Court.
 
 
 6
 Throughout this litigation, Internal Revenue has maintained that Imperial's indebtedness to Hambro, transferred to the investors in the form of interestbearing promissory notes, 'did not represent valid indebtedness for Federal income tax purposes.' This position is advanced despite the Commissioner's stipulation before the Tax Court that as of June 30, 1957, less than thirty days before the investors' acquisition, Imperial's notes to Hambro reflected a legitimate and outstanding debt.[3] Moreover, the acquisition agreement listed these valid notes as bargained and sold for a separate consideration of two thousand dollars. Under these circumstances, we think it was incumbent upon the government to demonstrate some workable theory explaining why the redemption of these notes should be regrded as a disguised payment of dividends.[4]
 
 
 7
 In answer, the Commissioner points to the 'economic realities' of the transaction, asserting that it is the substance and not the form of the acquisition agreement which controls the question of tax liability. We agree that the form of the transaction cannot create a tax immunity where it is designed to avoid legitimate taxation. But we hasten to echo the observation of the court in Edwards v. Commissioner, 415 F.2d 578, 582 (10 Cir. 1969), where the same issue was confronted:
 
 
 8
 The form of a contract is the considered and chosen method of expressing the substance of contractual agreements between parties and the dignity of contractual right cannot be judicially set aside simply because a tax benefit results either by design or accident. Form, absent exceptional circumstances, reflects substance.
 
 
 9
 The government urges application of this court's decision in Fin Hay Realty Co. v. United States, 398 F.2d 694 (3 Cir. 1968), where Judge Freedman reviewed an extensive list of criteria by which the courts and commentators have attempted to decipher the exact nature of an alleged indebtedness.[5] In so doing, however, he noted that 'neither any single criterion nor any series of criteria can provide a conclusive answer in the kaleidoscopic circumstances which individual cases present.' Id. at 697. For our part, we have concluded that application of these principles to the present case is at best inconclusvie. It would seem that the validity of the indebtedness portrayed here depends on factors quite distinct from those in Fin Hay, where the taxpayers were the creators of the debt.
 
 
 10
 One of these factors emphasized by the government, and strongly contested by the appellants, is the Commissioner's characterization of Imperial as 'defunct' at the time of the investors' acquisition. Taking the commonly accepted meaning of 'defunct' as being dead or having ceased to exist, it seems clear that Imperial was not defunct, at least in the technical sence, since its corporate structure was still extant. Although it is true that its board of directors had voted in 1955 to dissolve and liquidate the corporation, that project had not been achieved when Imperial passed into the investors' hands.
 
 
 11
 Even employing 'defunct' in a less technical sense, we have difficulty in accepting the Commissioner's characterization. The record here reveals that in the year immediately preceding the 1957 acquisition, Imperial had gross income in excess of $600,000. Gross receipts in the two years preceding this were both in excess of one million dollars with the corporation actually showing a slight taxable income in 1955.[6] And although it is true that overall operations were drastically curtailed in early 1957, as witnessed by gross receipts of roughly $7,000, we are left with the definite impression that Imperial was far from the corporate corpse the government has portrayed.
 
 
 12
 Certainly the situation is far removed from such cases as Cuyuna Realty Co. v. United States, 382 F.2d 298, 180 Ct.Cl. 879 (1967) and Jewell Ridge Coal Corp. v. Commissioner of Internal Revenue, 318 F.2d 695 (4 Cir. 1963), whose application the Commissioner urges here. In Cuyuna, the corporation sought to deduct interest payments on an indebtedness which had accumulated the dust of over 35 insolvent and inactive years, and in Jewell the acquired corporation was a railroad which was described as 'historically * * * a losing proposition.' In contract, Imperial had no comparable period of inactivity or history of economic non-viability. Its M.G. and British Motor franchises had retained their potential for profitable operation in spite of Hambro's inability to realize this potential. That in the first full year of operations under the investors' management Imperial's gross receipts exceeded $1,840,000 with taxable income of almost $80,000 attests to the vitality of the Imperial operation. Under such circumstances, we reach the same conclusion as the court in Edwards, supra, 415 F.2d at 583 that 'where the transaction creating the debtor-creditor relationship is not a sham or subterfuge, the terms of the transaction must be honored by the court.'
 
 
 13
 We find no evidence of sham or subterfuge here. The investors recognized the potential for profitably operating Imperial. Obviously they would not have undertaken the acquisition of Imperial without some disposition of Hambro's claims. Otherwise, their labors would have enriched only Hambro's vineyard. Understandably, the investors chose to have Hambro's assignment of the indebtedness. That this enabled them to assume a more advantageous tax position when the corporation realized the fruits of their resourceful and energetic management is no reason to disregard the form of the acquisition agreement.
 
 
 14
 The judgment of the Tax Court will be reversed.
 
 
 15
 SEITZ, Circuit Judge (dissenting).
 
 
 16
 The economic reality here is that in the summer of 1957 the investors acquired from Hambro the three outstanding shares of Imperial for $4,150. The investors also received Imperial's note to Hambro on which $129,324.06 was due. At the time Imperial's gross assets amounted to about $5,000. It had adopted a plan of dissolution in 1955 and sold its last car in 1956. It was closing its affairs when the acquisition in question took place. The Tax Court held that even if the note obligation retained its debt classification in the hands of Hambro, it became part of the capital of Imperial and no longer a bona fide indebtedness immediately upon its transfer to the investors. The Tax Court reasoned that, from the point of view of the investors, the transfer of the note simply removed a substantial outstanding claim against the business they were acquiring and in no way altered their singleminded purpose of acquiring only the franchise. The note, reasoned the Tax Court, had no independent economic significance in the purchase transaction.
 
 
 17
 I agree with the result reached by the Tax Court. Imperial was defunct and had no real capital; its only value to its owner, Hambro, was its franchise. Hambro also held a totally worthless note for $129,324.06 owed by the defunct Imperial. This note was transferred to the investors in the course of the purchase transaction. Regardless of the form of the transaction, I think the Tax Court was justified in concluding on this record that the transferees did not 'invest' in the worthless and insubstantial 'debt' involved here.
 
 
 18
 I realize that the Tax Court relied on Edwards v. Commissioner, 50 T.C. 220 (1969) which was later reversed by the Tenth Circuit, 415 F.2d 578 (1969). I think the Government's case here is much stronger than that in the Edwards case. If Edwards is though indistinguishable, then I disagree with its conclusion. I would affirm.
 
 
 
 [1]
 The parties concede that the Tax Court's ultimate finding that the Imperial payments were taxable dividends is not subject to the clearly erroneous rule. See Kaltreider v. Commissioner of Internal Revenue, 255 F.2d 833 (3 Cir. 1958)
 
 
 [2]
 This can be contrasted with losses of $5,700 in 1957 and $112,000 in 1956
 
 
 [3]
 The stipulation entered below reads:
 By June 30, 1957, Imperial's inventory had been liquidated and the debts of Imperial were reduced to $129,324.06 consisting of $115,721.28 principal and the balance interest. this debt was still owed Hambro and had arisen in the ordinary course of business from the purchase of cars from Hambro and had been converted into an interest bearing note payable to Hambro.
 
 
 [4]
 A different situation is presented where the validity of the debt is questioned from its outset. In such a case, the burden is upon the taxpayer to establish the existence of true indebtedness rather than a disguised capital contribution. See P. M. Finance Corp. v. Commissioner of Internal Revenue, 302 F.2d 786 (3 Cir. 1962)
 
 
 [5]
 The criteria listed were: '(1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the 'thinness' of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.'
 
 
 [6]
 Gross receipts in 1954 were $1,120,000 with a deficit of $48,900. In 1955, Imperial had taxable income of $1,277 based on gross receipts of $1,620,000