**Thomas H. HUTTON and Betty Hutton, Plaintiffs-Appellees,**

**v.**

**UNITED STATES of America, Defendant-Appellant.**

**No. 73–1623.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 6, 1974.

Decided July 5, 1974.

Wesley Filer, Tax Div., Dept. of Justice, for defendant-appellant; Scott P. Crampton Asst. Atty. Gen., Meyer Rothwacks, William A. Friedlander, Attys., Tax Div., Dept. of Justice, Washington, D. C., on brief; Thomas F. Turley, Jr., U. S. Atty., of counsel.

Charles P. Cobb, Memphis, Tenn., for plaintiffs-appellees; Dale Woodall, Evans, Petree, Cobb & Edwards, Memphis, Tenn., on brief.

Before MILLER, LIVELY and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

In this case the government appeals from a judgment of the United States District Court for the Western District of Tennessee, refunding to taxpayer plaintiffs Thomas H. Hutton and Betty Hutton $36,872.66 in federal income taxes and interest which the trial court found had been improperly assessed against them for the years 1964–1966.[1] The basis for the refund was the trial court's determination that certain payments received by the taxpayer during those years in retirement of corporate notes held by him were received in exchange for capital assets and, thus, were taxable as capital gain to the extent they exceeded the taxpayer's basis under Section 1232(a)(1) of the Internal Revenue Code of 1954 as amended. The government contends the payments were dividend income under Sections 301 and 316[2] of the Code.

The facts reported here are a summary of the extensive findings made by the trial judge, following the non-jury trial of the case.

Taxpayer Thomas H. Hutton and his late father, C. E. Hutton, were the controlling stockholders of Chuck Hutton, Inc., a Chrysler automobile dealership and distributorship located in Memphis, Tennessee. All other stock in the corporation was held by or for the benefit of members of the Hutton family.

In 1959 C. E. Hutton, as president of Chuck Hutton, Inc. (hereinafter Hutton Company), commenced negotiations on behalf of the company to buy all of the outstanding stock of the Bragg Auto Company, an Arkansas corporation, which had for years prior thereto operated a Chrysler dealership selling Plymouths and Chryslers in West Memphis, Arkansas.

At the time Bragg was incorporated in 1945, its four stockholders, apparently men of means and good repute in the West Memphis area, contributed a total capital of $82,000. The company operated profitably through 1951, lost relatively small amounts of money from 1952 through 1956, the losses becoming gradually greater until 1958 when the company discontinued selling automobiles. The several stockholders from time to time made loans to the company to cover its mounting indebtedness until, by October 31, 1959, a total of $231,404.30 was owed to the three stockholders of Bragg and one A. J. Thomas.

Negotiations carried on by C. E. Hutton in 1959 resulted in an agreement whereby Chuck Hutton Company agreed to acquire all of the stock in Bragg for the sum of $1,000. At the same time, it

---

1. Thomas and Betty Hutton, husband and wife, filed joint returns for the years in question, and thus sued jointly for refund. However, only Thomas Hutton was involved in the transactions giving rise to the income disputed in this case. Thus, hereinafter the word "taxpayer" will be used to refer to Thomas Hutton only.

2. § 316. *Dividend Defined*

(a) *General Rule.*—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

was also agreed that the outstanding indebtedness, then represented by four separate promissory notes given by Bragg, was to be transferred to the purchaser of the stock for a further sum of $19,000 which would then be deposited with a West Memphis attorney as escrow agent until the transaction could be finalized. It had also been agreed between C. E. Hutton and Thomas H. Hutton that they individually would, for that same price, take over and hold the notes in their own names.

The trial judge found that the purpose of Chuck Hutton Company in acquiring the stock of Bragg was to enable it to expand into the West Memphis, Arkansas sales area. Chuck Hutton had a long established policy of expansion through the purchase of existing dealerships elsewhere in the country. The trial court further found that a motive in this particular case was a policy decision by Chrysler Corporation in 1959 which prohibited the sale of both Plymouth and Dodge automobiles by the same dealer. Thus, Chuck Hutton Company stood to lose one of its franchises in the Memphis area unless it could establish another independent agency.[3]

Promptly after acquisition, the name of Bragg Auto Company was changed to Chuck Hutton of Memphis, Inc.,[4] reflecting further Chrysler Corporation instructions. Very little by way of tangible assets was owned by Bragg, but the trial court found that the evidence established that the reasons for the purchase were "sound from a management standpoint."[5] The trial court further accepted the testimony of the taxpayer

that the original plan to operate both corporations as independent dealerships in their respective areas failed when it was discovered less than 30 days after the transaction was consummated, in early 1960, that C. E. Hutton was terminally ill with leukemia. This circumstance, plus the sudden availability to the Huttons of the interest of another agency in Memphis resulted in a decision by Chuck Hutton Company to abandon its original plan to establish a dealership in West Memphis.

The trial court found upon the evidence that transfer of the notes in question was not made on the books of the corporation until December of 1960. However, the court found that it had at all times been understood that ownership of the notes would pass to the father and son as individuals and not to Chuck Hutton Company.[6] The court accepted in explanation of this decision testimony that Chuck Hutton Company was already heavily indebted to C. E. Hutton, presumably because its successful but rapid expansion into other states had placed heavy demands upon its capital. After the closing of the stock sale, certain inventory was transferred from Chuck Hutton Company to Bragg at book value. Thereafter Bragg engaged in the sale and distribution of Dodge automobiles until it was dissolved in 1966 as a result of certain requirements imposed by Chrysler Corporation.

Taxpayer and his father each owned notes equalling one half of their total face value. C. E. Hutton died on October 16, 1961, and his estate became the owner of his share of the notes.

3. While Bragg's franchise was not transferred or included in its assets at the time the stock was purchased, the transaction was encouraged by Chrysler.

4. To avoid confusion, we shall continue herein to refer to that company as "Bragg."

5. The trial court found that among the advantages in the acquisition of the Bragg Company were "the obtaining of an existing customer list; the acquiring of records showing

accounts receivable experience and the goodwill of those who had been doing business in the particular area where the expansion was to occur."

6. The trial court further found that the notes were held by the Hutton Company in an escrow account, that the books never reflected that company as being the owner of the notes, and that the escrow account was closed when the notes were transferred.

It is the retirement of the notes at their full face value by Bragg which gives rise to the dispute here.

The following reflects the schedule of payments made: [7]

| Date | T. H. Hutton | Estate of Chas. E. Hutton |
|---|---|---|
| 9/12/63 | $12,350.00 | $12,350.00 |
| 8/20/64 | 12,500.00 | 12,500.00 |
| 9/10/65 | 13,325.66 | 13,325.67 |
| 5/ 4/66 | 12,500.00 | 12,500.00 |
| 9/28/66 | 65,000.00 | 65,000.00 |
| | $115,675.66 | $115,675.67 |

Based upon the foregoing facts and others recited in his opinion, District Judge Robert M. McRae, Jr. found, contrary to the government's contention, that the four notes held by the stockholders of Bragg Auto Company in the first instance represented a valid corporate indebtedness of Bragg and not a contribution to capital as claimed by the government.

■ Our careful review of the entire record satisfies us that there was ample evidence to support Judge McRae's finding in this regard, a finding which he reached after the close scrutiny of all of the evidence before him and a matching of that evidence against the criteria utilized by courts in making such determinations. See Donisi v. Commissioner of Internal Revenue, 405 F.2d 481 (6th Cir. 1968); Smith v. C. I. R., 370 F.2d 178 (6th Cir. 1966).[8]

Having concluded that the payments made to Bragg Auto by its stockholders in the 1950's did, in fact, constitute loans and not contributions to capital, the trial court then proceeded to determine whether the promissory notes evidencing those loans retained their character when purchased by the Huttons. He found that C. E. Hutton and taxpayer Thomas H. Hutton purchased the notes "at a separate consideration for $19,000." The full face value of C. E. Hutton's interest in the notes was included in the latter's estate for estate tax purposes and federal estate tax paid thereon.[9]

In its argument before the district court, the government urged, as it did unsuccessfully in Imperial Car Distributors v. Commissioner of Internal Revenue, 427 F.2d 1334 (3rd Cir. 1970), that the economic realities of the total transaction compelled the court to ignore the form of the transaction and recognize its substance. Economic realities, the government claimed, clearly showed the notes to have been worthless, in effect "an economic nullity," and their use as merely a scheme to avoid the heavy taxation which would have resulted from their treatment as ordinary income to the taxpayer. The trial judge disagreed, finding:

"The evidence in this case does not establish that the purchase of Bragg Auto was a sham or for the purpose of avoiding taxes. The evidence does

7. While Bragg had shown operating profits in 1964 and 1965, it had no accumulated earnings and profits at the time it was liquidated in October 1966. It will be noted that in the year of liquidation, payments totalling $77,500 were made each to taxpayer and his father's estate.

8. In Smith v. C.I.R., supra, this court held the following criteria are to be considered in making the factual determination of whether payments to a corporation constitute a loan of contribution to capital: "the presence or absence of a maturity date of the obligation, the name given to the writing (if any) evidencing the claimed obligation, the source of payments and repayments, the adequacy or inadequacy of capitalization, identity (or lack of identity) of interest between creditor and stockholder, the corporation's ability to obtain

financing from independent lending institutions, and the timing of the advance with reference to the organization of the corporation." (370 F.2d at 180). *Smith* held that the trial court's finding in this regard could not be disturbed unless clearly erroneous.

9. We do not attach the significance to this fact that the trial court did. The government correctly points out in its brief that the ultimate estate tax liability was not increased by the inclusion of the notes at their face value, for in so doing, the value of the stock left to the estate was reduced, pro tanto, and hence the value of the estate for tax purposes. We note, however, that this was not the sole or even controlling factor in the trial court's ultimate conclusions regarding taxpayer's intent.

establish the reasons for the purchase of Bragg Auto as being sound from a management standpoint, such as the availability of a customer list, and the desire to purchase an existing agency with support of local residents.

"The efforts made to locate in West Memphis are supported by the evidence and attest to the fact that the purchase was at the time it was made considered to be in the best interest of Chuck Hutton Co. The refusal of Chrysler to select a site and the terminal illness of C. E. Hutton support the ultimate failure to locate in West Memphis.

"By the same token, the dissolution of Chuck Hutton Co. of Memphis, Inc. in 1966 does not appear to have been the result of any "tax gimmick" which had at that time succeeded. Again there is evidence that the liquidation was the result of Chrysler policy change which necessarily carries much weight in the business decisions of its dealers."

The court, thereupon, went on to hold:

"Having concluded that the original indebtedness was not a contribution to capital but was in fact a loan, then Imperial Car Distributors, Inc. v. Commissioner [Commissioner of Internal Revenue], supra, becomes controlling."

In Imperial Car Distributors, Inc. v. Commissioner of Internal Revenue, supra, four individual investors negotiated the purchase of Imperial, a wholly owned corporate subsidiary of Hambro Automotive Corporation. Imperial at the time owed Hambro over $115,000 for merchandise, the debt being converted into notes payable to Hambro in the amount of $129,000. The four investors entered into an agreement to buy all of the stock in Imperial for $2,150 and also

to pay an additional $2,500 for an assignment of the notes which were thereupon transferred to the four investors. Thereafter, Imperial prospered and regained solvency, finally paying off the notes to the investors at their face value. The third circuit, in Imperial, acknowledged that the burden is upon the taxpayer in the first instance to establish the existence of a true original indebtedness rather than a disguised capital contribution.[10] Noting that this burden had been met in Imperial by a stipulation acknowledging the existence of a legitimate and outstanding debt, and further that the acquisition agreement listed the notes as bargained for and sold for a separate consideration, the Court of Appeals for the Third Circuit observed:

"Under these circumstances, we think it was incumbent upon the government to demonstrate some workable theory explaining why the redemption of these notes should be regarded as a disguised payment of dividends." 427 F.2d 1336.

The government in Imperial was unable to show that the acquisition of the corporation by the investors was a sham, and the notes were therefore held to constitute valid indebtedness the redemption of which resulted in capital gain to the taxpayer, to the extent the payment exceeded his basis in the notes.

Applying the same rationale to the facts of this case, District Judge McRae held that the good faith and legitimate business purpose of the entire transaction having been established and shown not to be a sham, the originally valid notes, which had been bargained for and purchased at a separate consideration, "retained their status as valid corporate indebtedness after they became the property of the Huttons." [11]

10. See Imperial Car Distributors, Inc. v. Commissioner of Internal Revenue, supra, at 1336, n. 4, where that court, citing P. M. Finance Corp. v. Commissioner of Internal Revenue, 302 F.2d 786 (3rd Cir. 1962) stated:

"A different situation is presented where the validity of the debt is questioned from the outset. In such a case, the burden is upon

the taxpayer to establish the existence of true indebtedness rather than a disguised capital contribution."

11. The court below then went on to consider the issue of whether or not the payments of the notes in 1966 should be construed as dividends where there were neither current earnings and profits in 1966 nor accumulated earn-

We admit to sharing some of the government's expressed skepticism concerning the intent and purpose of a transaction which was so beneficial to the taxpayer and which saw him funnel to himself in the form of capital gains so large a sum of money from so small and questionable an investment. We are also aware of the many cases in this circuit and elsewhere which admonish us, particularly where federal tax laws are concerned, that "In cases where the legal characterization of economic facts is decisive, the principle is well established that the tax consequences should be determined by the economic substance of the transaction, not the labels put on it for property law (or tax avoidance) purposes." Union Planters National Bank of Memphis v. United States, 426 F.2d 115, 118 (6th Cir. 1970). Likewise, "In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 255, 60 S.Ct. 209, 210, 84 L.Ed. 226 (1939). See also Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959).

It is urged by the government here that the economic realities of the transaction compel us to conclude that a motive of tax avoidance had to be present and dominant at all times, and particularly when the notes in question passed through the hands of Mr. C. E. Nance, escrow agent, and the books of Hutton Company and to the taxpayer and his father. Economic reality, it is urged, would have compelled the Hutton Company, but for an expected tax advantage, to have cancelled the notes rather than to have passed them even to a new and friendly holder who could thus potentially seek reimbursement for the face amount while having invested less than ten percent thereof. See Knetsch v.

United States, 364 U.S. 361, 365, 81 S. Ct. 132, 134, 5 L.Ed.2d 128 (1960), in which the Supreme Court upheld the finding by the trial court that a tax sham existed where "no economic gain could be achieved . . . without regard to tax consequences".

The government in this regard, however, is taking issue with the factual findings of the trial court which in fact found economic reality beyond tax consequences when it determined that the transactions involved, viewed in their entirety, reflected valid business motivations on the part of the Hutton Company. Indeed the trial court found that the Company had a business motivation for the transfer of the notes to taxpayer and his father, to avoid further indebtedness.

■■  While the factual issue may be close, we must, of course, accept the findings of the trial court unless we conclude they are clearly erroneous, F.R.C.P. 52, i. e. unless we are left with a "definite and firm conviction that a mistake has been committed". United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We are unable to so find.

While much of the evidence before the trial judge was documentary in nature, it was also incumbent upon him to weigh the testimony of the several witnesses who testified to the transaction or parts of it. It is clear from that testimony and the trial judge's treatment of it that the acquistion of Bragg, whatever may have been its potential for tax avoidance schemes, was not solely for such purposes, if indeed they provided any motive at all at the outset. The plaintiffs fully carried their burden of proof insofar as it was necessary to show that the acquisition of Bragg was but one phase of a multiple phase program of expansion of the Hutton Company by acquisition of dealerships of Chrysler products throughout the country under circum-

ings or profits from prior years available in such year. The court concluded that payments made in 1966, as well as those made in previous years, were not dividends. This

issue is not before us, as the government has advanced no objection to the trial court's treatment thereof.

stances in which the dealership had failed or was failing. Their success elsewhere gave C. E. Hutton and his son good reason to believe they could duplicate it in the West Memphis, Arkansas area by acquiring the interests of a floundering but potentially competing agency.

The trial court's finding regarding the taxpayer's intent in acquiring Bragg was a key finding on the issue of whether a tax sham was involved. Imperial Car, *supra*. While different inferences may indeed be possible, it is not for this court to substitute its judgment for the factual findings and inferences of the trial court. See Donisi v. Commissioner of Internal Revenue, *supra*.[12] The importance of the function of the trial court in cases such as this was ably stated by Justice Brennan in Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960):

> "Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact." 363 U.S. at 289, 80 S.Ct. at 1198.

The principal thrust of the government's case below was that the notes in question had never from their inception amounted to valid corporate indebtedness of Bragg, but were rather a thinly disguised contribution to capital. The trial judge's finding to the contrary is amply supported by the evidence and, in-

deed, there is little to rebut such a finding.

The government further sought below to demonstrate that even if the notes once represented a valid corporated indebtedness, they lost that character when obtained by the taxpayer. In this regard, the government concedes that "the transactions involved herein took the form of payments on corporate indebtedness which would ordinarily give rise to capital gains income to the extent of the retirement proceeds over the holder's basis in the surrendered notes. See Section 1232(a)(1) of the Internal Revenue Code of 1954 . . . . ." and

> "Thus, if mere form controls, the district court was correct in holding that taxpayer realized capital gains income."

We agree with the government that mere form should not control. Planters National Bank of Memphis v. United States, *supra*. But we are of the opinion that the district court properly looked to the entire transaction in assessing the economic realities, and correctly applied the law to the facts found by it in ruling that, under those facts, the form used reflected substance.

> "It is of course true that the contractual form of a transaction cannot control the imposition of tax liability when the realities of the transaction show that form does not represent a bona fide and actual agreement. But it is equally true that the form of a contract is the considered and chosen method of expressing the substance of contractual agreements between parties and the dignity of contractual right cannot be judicially set aside simply because a tax benefit results either by design or accident. Form, absent exceptional circumstances, reflects substance. We do not find present in this case any of the traditional exceptional circumstances that justify the piercing of form to impose an ex-

12. In that case, this court noted that determinations of fact made by the trial court in a tax case, "including factual inferences from the undisputed basic facts, may be set aside on appeal only if they are clearly erroneous." 405 F.2d at 482.

ceptional tax liability." Edwards v. C. I. R., 415 F.2d 578, 582 (10th Cir. 1969).

On the facts before it the district court found that the entire transaction, including the transfer assignment of the notes to taxpayer in the first instance, the acquisition of Bragg by the Hutton Company, and the ultimate payment of the notes were prompted by valid business considerations, were not a "sham" and the dissolution of Bragg in 1966 was not the result of any "tax gimmick". This finding is not clearly erroneous.

In addition to its principal challenge, the government now argues, for the first time on this appeal, that even if the notes represented a valid corporate indebtedness in taxpayer's own hands, nonetheless the repayment of those notes should be treated as a dividend because it was made with assets transferred to Bragg from Hutton Company. In this regard, the government urges that we adopt and apply on appeal the principles of Sammons v. Commissioner of Internal Revenue, 472 F.2d 449 (5th Cir. 1972), a theory neither advanced nor litigated below.

In *Sammons*, funds received by taxpayer in retirement of a debt, the validity of which was not questioned, were held to constitute a dividend, where the debt was paid with funds transferred from corporations controlled by the taxpayer. *Sammons* articulated tests, which, if met, result in dividend treatment of funds received by the taxpayer regardless of the existence of a valid indebtedness.[13] Among these is a subjective test of intent intended to differentiate between normal business transactions and "those transactions designed primarily to benefit the stockholder". *Sammons, supra*, at page 451. The government urges that we adopt *Sammons* in this circuit and apply it to the case now before us. We leave this interesting suggestion to another case and another day.[14]

■ The general rule is that an appellate court will not entertain an argument based upon a theory not litigated below. Helverson v. Wood, 309 U.S. 344, 60 S.Ct. 551, 84 L.Ed. 796 (1940); Allen Industries v. C. I. R., 414 F.2d 983 (6th Cir. 1969). The government, however, urges that application of *Sammons* here

13. In Sammons v. Commissioner of Internal Revenue, *supra*, Sammons was the owner of 99% of Reserve Life Insurance Company which owned substantially all of the stock of Standard Steel Works. Standard in turn owned Aero-Test Equipment Company. Aero encountered financial difficulty and was unable to meet its obligations which included $142,000 in debts which Sammons had acquired through the discount purchase of accounts due other Aero creditors. Reserve and other corporations controlled by Sammons thereupon transferred a large sum of money to Aero, which funds were used to repay Aero's obligations including the $142,000 debt to Sammons. While the validity of the debt as held by Sammons was itself not questioned, its repayment with funds transferred to Aero by corporations controlled by Sammons with the intent that such funds be used to benefit him, was held to constitute a dividend. *Sammons* held that, initially, two tests must be met for the intercorporation transfer of funds to result in a dividend to a shareholder: (1) an objective test: did the transfer cause funds or other property to leave the control of the transferor corporation and did it allow the stockholder to exercise control

over such funds either directly or indirectly through some instrumentality other than the transferor corporation? and (2) a subjective test: was the transfer made primarily for the benefit of the stockholder? In addition, where, as in *Sammons*, the alignment of the corporations involved in the transfer is vertical rather than horizontal, two additional criteria must be met: "A transfer of funds by a corporation to another corporation which the former owns directly or indirectly can be a constructive dividend to the controlling stockholder only if (1) the funds are diverted away from the parent-subsidiary corporate structure and come within the control of the stockholder, and (2) no adequate consideration for the diversion passes from the stockholder to the corporation." 472 F.2d at 454.

14. We note, however, that in McLemore v. Commissioner, 32 T.C.M. 59 (1973) affirmed per curiam by this court, 494 F.2d 1350 (decided and filed May 3, 1974), the Tax Court relied in part upon Sammons v. Commissioner of Internal Revenue, *supra*, in deciding that the transfer of funds between related corporations resulted in a dividend to the taxpayer-shareholder of both corporations.

would merely require a proper interpretation and application of the law without the need for new or amplified factual determination, an exception to the general rule. Frederick Steel Co. v. Commissioner of Internal Revenue, 375 F.2d 351 (6th Cir. 1967).[15] On the contrary, we believe that application of *Sammons* would indeed require additional and different factual findings not made by the court below. Further, we are not disposed to remand for that purpose, as suggested as an alternative to outright reversal, because we find that, whatever may be the merits of *Sammons* generally, the evidence on the record in this case would not support a finding that its tests have been met in at least two particulars.

In the first place, it is not nearly so clear as the government contends that the monies which the taxpayer received in retirement of the notes came in fact from the Chuck Hutton Company. It is true that inventory had been transferred from the Chuck Hutton Company to Bragg after Bragg was acquired in 1960, but it is also true that Bragg thereafter operated as a going concern and actually involved itself in the profitable sale of automobiles before finally liquidating six years later. It required five separate payments between 1963 and 1966 in order to retire the notes. Obviously, much took place during that period. The trial judge was not called upon to determine to what extent, if any, the assets transferred from Chuck Hutton Company to Bragg ultimately found their way to taxpayers by way of the payment of the notes. We cannot supply that void on appeal. Moreover, we believe it manifest from the record and the findings of the trial judge, findings which we hold not to be clearly erroneous, that the entire transaction was car-

ried out for valid and legitimate corporate business reasons. Those reasons, already fully set forth earlier in this opinion and by the trial judge, refute any assertion by the government that the primary purpose of the transfer of the monies to Bragg was to benefit the taxpayer through affording him capital gains treatment in the repayment of the notes.

Accordingly, the judgment of the district court is affirmed.

---

15. In Frederick Steel Co. v. C.I.R., *supra*, this court recognized an exception to the general rule that issues not raised before the trial court will not be considered on appeal, when it agreed to hear an argument made for the first time on appeal, that a particular statute was applicable to the case. The court noted the issue was purely one of the "application of the statute to determine the taxes due," and required no additional findings of fact. 375 F.2d at 355. See also, Black Motor Co. v. Commissioner of Internal Revenue, 125 F. 2d 977 (6th Cir. 1942).