**J. E. CASNER and Una Casner et al., Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 29290.**

United States Court of Appeals, Fifth Circuit.

Sept. 27, 1971.

Rehearing Denied Nov. 9, 1971.

Towner Leeper, El Paso, Tex., for petitioners-appellants.

Johnnie M. Walters, Asst. Atty. Gen., Ann E. Belanger, Atty., Tax Div., U. S. Dept. of Justice, K. Martin Worthy, Chief Counsel, Daniel J. Boyer, Atty., Internal Revenue Service, Lee A. Jackson, Atty., Tax Div., William A. Friedlander, Robert I. Waxman, Attys., U. S. Dept. of Justice, Washington, D. C., for respondent-appellee.

Before COLEMAN, INGRAHAM, and WILKEY,* Circuit Judges.

COLEMAN, Circuit Judge:

In this case we must decide the tax consequences of a set of involved transactions which took place among the shareholders of two incorporated automobile dealerships in Texas.

Relative to the cash distributions from the paid-in capital surplus accounts of "Alpine" and "Marfa" made to the selling stockholders, J. E. Casner and B. R. Slight, we hold that such cash distributions to the selling stockholders constituted in fact a part of the purchase price paid to them for their stock and therefore were properly subject to taxation under the capital gain provisions of the Internal Revenue Code of 1954. Such cash distributions to the selling stockholders did not constitute taxable dividends to the selling stockholders under the mandates of §§ 61(a) (7) and 316(a) of the Internal Revenue Code of 1954. As to the appellants, J. E. Casner and B. R. Slight, the decision of the Tax Court is reversed.

Having found that the cash distributions to the selling stockholders did not constitute taxable dividends, we hold that the cash distributions to the selling stockholders constituted taxable dividends to the buying stockholders under the statutory mandates of §§ 61(a) (7) and 316(a) of the Internal Revenue Code of 1954 in proportion to their stock purchases.

Relative to the cash distributions from the paid-in capital surplus accounts of "Alpine" and "Marfa" made directly to the buying shareholders and thereafter paid by the buying shareholders to the

---

* Judge of the United States Court of Appeals for the District of Columbia, sitting by designation.

selling shareholders, such cash distributions did result in taxable dividends under the mandates of §§ 61(a) (7) and 316(a) of the Internal Revenue Code of 1954. As to the appellants, Forrest Walker and J. D. Holman, the decision of the Tax Court is affirmed.

## I

## THE FACTS

Despite the difficulty of it, we first undertake a clear exposition of the facts. There is no dispute about what was done. The controversy is over the consequences.

Taxpayers, J. E. Casner and Una J. Casner; B. R. Slight and Winifred Slight; Forrest Walker and Geraldine Walker; and J. D. Holman and Una Holman are married couples who, at the time their petitions in these cases were filed, resided in Alpine, Texas. Each couple filed a joint federal income tax return for the calendar year 1964 with the District Director of Internal Revenue at Austin.

Casner Motor Company of Alpine, Texas, Inc., is a Texas corporation with its principal place of business in Alpine, Texas. This corporation will hereinafter be referred to only as "Alpine". Casner Motor Company of Marfa, Texas, Inc., is a Texas corporation with its principal place of business in Marfa, Texas. This corporation will hereinafter be referred to only as "Marfa".

In January, 1957, J. E. Casner, B. R. Slight, Forrest Walker, and J. D. Holman formed "Alpine". They transferred to "Alpine" assets from their previously existing partnership having a book value of $168,580.99 and liabilities of $11,910.57. "Alpine" issued $100,000 of $10 par value common stock and credited a paid-in surplus of $56,670.42. The stock was issued as follows:

| Stockholder | No. of Shares |
|---|---|
| Casner | 4,177 |
| Holman | 2,500 |
| Slight | 823 |
| Walker | 2,500 |
| Total | 10,000 |

In January, 1957, J. E. Casner, Jack Edwards, H. F. Darr, and L. E. Howard formed "Marfa". They transferred to "Marfa" assets having a book value of $139,516.20, and liabilities of $36,082.73. "Marfa" issued $100,000 of $10 par value common stock and credited a paid-in surplus of $3,433.47. The stock was issued as follows:

| Stockholder | No. of Shares |
|---|---|
| Casner | 6,750 |
| Edwards | 2,500 |
| Darr | 750 |
| Howard | None |
| Total | 10,000 |

On February 5 and 6, 1960, the stockholders of "Marfa" and "Alpine" executed mutual consent agreements in regard to their stock. The agreements provided that upon the death of a stockholder the issuing corporation would be presented the decedent's stock and would pay therefor the value of the stock in a sum not less than book value. It was further provided that no living shareholder would sell or otherwise dispose of his stock to anyone other than another shareholder and that if a living shareholder should desire to sell his stock, the corporation would have the right to purchase at not less than corporate book value.

Also on February 5, 1960, Casner transferred to Forrest Walker 833 shares of "Alpine" stock.

On April 1, 1961, Casner, Holman, Walker, and Slight, the stockholders of "Alpine", transferred to "Alpine" additional assets having a book value of $15,032.81. "Alpine" issued $9,680 of $10 par value common stock and credited a paid-in surplus of $5,352.81. The stock was issued as follows:

| Stockholder | No. of Shares |
|---|---|
| Casner | 387 |
| Holman | 242 |
| Walker | 242 |
| Slight | 97 |
| Total | 968 |

Between 1957 and 1963 Casner sold 600 shares of "Marfa" stock to L. E. Howard and gratuitously transferred two shares to J. D. Holman, his son-in-law.

Since their corporate formation, "Alpine" and "Marfa" have been operating as retail dealers of automobiles and trucks. They operate under "Dealer Selling Agreements" with the Chevrolet Division of General Motors and their product line includes all of General Motors' automotive and trucking line.

In 1963, Mr. Casner was 75 years old. During that year R. P. Paulk, zone manager of Chevrolet, asked Casner whether he had any plans to retire. Paulk had been instructed by General Motors to contact all dealers in his area over 65 and urge them to sell their shares of stock and retire.

By early 1964, Casner was becoming inactive in his automobile dealerships. Forrest Walker and Jack Edwards had assumed over-all responsibility for the operations of "Alpine" and "Marfa", respectively.

When Jack Edwards died on March 2, 1964, Casner wrote Chevrolet to request an extension of time to buy Jack Edwards' stock in "Marfa". Casner's request was granted. Thereafter, Casner purchased Edwards' "Marfa" stock at book value as of January 1, 1964, which included surplus, for $32,586.28.

However, the death of Edwards gave Chevrolet, acting through their new zone manager, O. E. Alexander, Jr., another opportunity to encourage Casner to dispose of his stockholdings in both "Alpine" and "Marfa". During March, 1964, Walker and Casner met twice with Alexander in El Paso, Texas. At the second meeting, Casner agreed to dispose of his stock. At the same meeting. Casner requested that his son-in-law, Holman, be designated as the dealer at "Marfa". Chevrolet refused to appoint anyone other than Herb Harlow, who had been sales manager of "Alpine". However, Walker's request to bring Kenneth Stucke into the "Alpine" dealership was granted. Since Slight had also become inactive in the management of "Alpine," he also agreed to sell his stock in that corporation.

The dealership agreements of General Motors require individuals in whose name dealership agreements are executed to own a substantial percentage of the corporate stock. For that reason, and because Forrest Walker had already assumed responsibility for "Alpine", Chevrolet was agreeable to Walker acquiring a greater percentage of stock in "Alpine".

When Casner agreed to sell his stock, he stated that he wanted to receive as much cash as possible from the sale. It was anticipated, however, that the purchasers would not have sufficient cash to purchase Casner's shares of "Marfa" and "Alpine" at their current book values. Thereupon, Alexander, the Chevrolet zone manager, recommended to Casner that "Marfa" and "Alpine" distribute some of their cash. This would reduce the book values of the shares which Casner and Slight were preparing to sell and would also get cash into the hands of the other shareholders for the purchase of the Slight and Casner stock.

Following the two meetings between Alexander, Walker, and Casner, it was decided that a certified public accountant (CPA) should compute the book values of "Alpine" and "Marfa" stock, as of March 31, 1964. The CPA was told that Slight would sell all of his shares and Casner would sell some of his to *new* shareholders, Herb Harlow and Kenneth Stucke. Casner would then sell his remaining shares to existing shareholders, Holman and Walker.

The shareholders of "Marfa" held a special meeting on March 26, 1964. The minutes of the meeting stated in part:

Mr. J. E. Casner, President and Acting Chairman of the meeting, stated that he was desirous of retiring from active management in the corporation and that in order to do so, he wanted to sell his stock and that in the name of Mrs. Casner to the other stockholders in accordance with the Mutual Consent Agreement dated February 5, 1960, and in order to reduce the value of the stock he suggested that the

paid-in capital surplus account of the corporation, in the amount of $3,433.-47 be distributed to the present stockholders.

The Board of Directors of "Marfa" held a special meeting on March 26, 1964, following the conclusion of the special stockholders meeting. The minutes stated in part:

On motion duly made and carried, the officers were authorized to make cash distribution of the paid-in capital surplus of the corporation in the amount of $3,433.47 to the shareholders of record on that date with payment to be made at a future date when funds are available for distribution.

On motion duly made and carried, the value of capital stock outstanding for transfer purposes on March 31, 1964, is acknowledged to be the par value of $10 per share plus the value of the earned surplus of the corporation as reflected on the books of the corporation on March 31, 1964, in accordance with the Mutual Consent Agreement executed by all shareholders as of February 5, 1960.

On motion duly made and carried, the Board of Directors accepted the resignation of J. E. Casner as President and Director, effective with his transfer of stock to others on March 31, 1964, and commended him for his services as a President and Director, and accepted resignation of Una J. Casner as Director.

The shareholders of "Alpine" held a special meeting on March 27, 1964. The minutes of that meeting stated in part:

Mr. J. E. Casner, President and Acting Chairman of the meeting, stated that he was desirous of retiring from active management in the corporation and that in order to do so, he wanted to sell his stock and that in the name of Mrs. Casner to the other stockholders in accordance with the Mutual Consent Agreement dated February 6, 1960, and in order to reduce the value of the stock he suggested that the Paid-in Capital Surplus of the corpo-

ration, in the amount of $62,023.23 be distributed to the present stockholders. In order to keep the reduction of cash to a minimum, he stated that he would be willing to purchase the mortgage note of Alpine Butane Company, Inc. for the balance owing on March 31, 1964, and the 1964 Cadillac car that he is using. B. R. Slight stated that he would purchase the 1964 Chevrolet car that he is using to further reduce the amount of cash required to be paid out of the capital surplus, as he would be selling his stock at the same time.

The Board of Directors of "Alpine" held a meeting on March 27, 1964, after the conclusion of the special shareholder's meeting. The minutes stated in part:

On motion duly made and carried, the officers were authorized to make cash distribution of the Paid-in Capital Surplus of the corporation in the amount of $62,023.23 to the shareholders of record on this date, with payment to be made at a future date when funds are available for distribution.

On motion duly made and carried, the value of capital stock outstanding for transfer purposes on March 31, 1964 is acknowledged to be the par value of $10 per share plus the value of the earned surplus of the corporation as reflected on the books of the corporation on March 31, 1964, in accordance with the Mutual Consent Agreement executed by all shareholders as of February 6, 1960.

On motion duly made and carried, the officers of the corporation were authorized, empowered and directed to sell the promissory Vendor's Lien and Deed of Trust Note of the Alpine Butane Company, Inc., Dexter D. Thomas, President, and Dexter D. Thomas and Katie B. Thomas, Individually, dated March 8, 1963, in the original principal sum of $22,500.00, upon the condition that the same shall be sold for its book value on March 31, 1964 to J. E. Casner and they are also au-

thorized to execute such necessary instrument of transfer and endorsement of transfer to J. E. Casner, with payment for the note to be made at time of distribution of Capital Surplus.

On motion duly made and carried, the Board of Directors accepted the resignation of J. E. Casner as President and Director, effective with his transfer of stock to others on March 31, 1964, and commended him for his services as President and Director.

On motion duly made and carried, the Board of Directors accepted the resignation of B. R. Slight as a Director, effective with his transfer of stock on March 31, 1964, and commended him for his services as a Director.

On motion duly made and carried, the officers were directed to sell the company cars used in the business to J. E. Casner—1964 Cadillac for $4,900.00 and to B. R. Slight—1964 Chevrolet for $3,000.00 with payment to be made upon distribution of Capital Surplus.

In the latter part of May, 1964, the CPA prepared the minutes for both corporations as well as new stock certificates reflecting the proposed and agreed upon changes in ownership. He dated the minutes back to March 26 and 27, 1964, the actual dates of the corporate orders.

The CPA decided to set aside consummation of Casner's stock transactions until he had completed all pending tax preparation work, due April 15. He was not able to complete his working papers until May 25, 1964. The working papers contained the note: "Sales of Stock are after the distribution in cash by both corporations of the Paid-in Capital Surplus, and at book values of the stock as of March 31, 1964".

On May 26, 1964, the CPA wrote the following letter to Bedford Walters, the chief accountant of "Alpine":

"In accordance with the review and agreement of the officers of the company, it is suggested that you make distribution of the paid-in capital sur-

plus in the amount of $62,023.23 to the shareholders of record as of March 27, 1964, as follows:

| Stockholder | No. of Shares | Paid-in Capital Surplus |
|---|---|---|
| J. E. Casner | 2,476 | $14,001.62 |
| Una J. Casner | 1,255 | 7,096.93 |
| J. D. and Una J. Holman | 2,742 | 15,505.80 |
| Forrest C. Walker | 3,575 | 20,216.35 |
| B. R. Slight | 920 | 5,202.53 |
| Total | 10,968 | $62,023.23 |

It is understood that Mr. Casner will purchase from company the mortgage note from Alpine Butane Company at the book value on March 31, 1964, of $20,100.00, after adjustment for reduction due to payments in April and May of $200 each on the principal and interest received of $200. The present note balance is $19,700.00 and the interest earned should apply to him and reduce the settlement to $19,500.00, as the transaction was to take place on March 31, 1964. In addition it is understood that he will purchase the 1964 Cadillac car that he is using for $4,900.00. In the settlement with B. R. Slight, it is understood that he will purchase the 1964 Chevrolet that he is using for $3,000.00.

After the above transactions the net reduction in cash funds of the company will be $62,023.23 for distribution of capital surplus, less purchases from the company of $27,400.00 or a net of $34,623.23."

The paid-in capital surplus of "Alpine" and "Marfa" was distributed pro rata on May 27 and May 28, 1964, by the respective corporations to their stockholders as follows:

| Stockholder | "Alpine" | "Marfa" |
|---|---|---|
| J. E. Casner | $21,098.55 | $2,969.26 |
| J. D. Holman | 15,505.80 | .69 |
| F. Walker | 20,216.35 | ———— |
| B. R. Slight | 5,202.53 | ———— |
| L. E. Howard | ———— | 206.01 |
| H. F. Darr | ———— | 257.51 |
| Total | $62,023.23 | $3,433.47 |

On March 27, 1964, and immediately prior to the distribution of the paid-in

surplus of "Alpine" and "Marfa" the stock of the two corporations was owned as follows:

| Stockholder | No. Shares of "Alpine" | No. Shares of "Marfa" |
|---|---|---|
| J. E. Casner | 3,731 | 8,648 |
| J. D. Holman | 2,742 | 2 |
| F. Walker | 3,575 | —— |
| B. R. Slight | 920 | —— |
| L. E. Howard | —— | 600 |
| H. F. Darr | —— | 750 |
| Total | 10,968 | 10,000 |

On May 27, 1964, the CPA wrote Alfred E. Creigh, Jr., an attorney in Alpine. The CPA asked him to prepare the necessary promissory notes and agreements regarding Casner's and Slight's transfer of "Alpine" stock to Kenneth Stucke. His letter stated in part:

> The stock will be transferred under date of March 31, 1964, and the notes to be prepared should be dated the same date. The stock certificates will be issued in the name of Kenneth Stucke but will be held with the notes as collateral. The two notes in the amounts shown above will be for a period of five years with interest at 5% per annum on the unpaid balances, with any payments made on the notes to apply first to payment of interest and any balances as a reduction of principal.

The notes and agreements were backdated to March 31, 1964.

Contemporaneously with the pro rata distribution to the shareholders of "Alpine" and "Marfa", the following transactions occurred:

(1) Casner sold Walker 1909 shares of "Alpine" having a book value of $32,669.87 and 2,500 shares of "Marfa" having a book value of $31,727.91. Walker paid Casner by a check dated June 3, 1964, for $19,072.78, and transferred a secured note receivable for the balance.

(2) Casner gave Holman 2,426 shares of "Marfa" stock having a book value of $30,788.77. Casner sold Holman 1,222 shares of "Marfa" having a book value of $15,505.80. Holman paid Casner by endorsing to Casner his check from "Alpine" for $15,505.80.

(3) Casner sold Herbert Harlow 2,500 shares of "Marfa" stock having a book value of $31,727.91. Harlow paid Casner by executing a promissory note to him for the entire amount.

(4) Casner sold Kenneth Stucke 1,822 shares of "Alpine" having a book value of $31,180.99. Stucke paid Casner by a check dated June 3, 1964, for $1,180.99, and executed a promissory note for the balance.

(5). Slight sold Stucke his 920 shares of "Alpine" having a book value of $15,744.51. Stucke paid Slight $744.51 cash and executed a promissory note for the balance.

In the statutory notices of deficiency issued to the petitioners, the Commissioner of Internal Revenue, respondent here, stated that petitioners received unreported dividends in the taxable year 1964, as follows:

| Petitioners | "Alpine" | "Marfa" | Casner Industries, Inc. |
|---|---|---|---|
| J. E. and Una Casner | $21,098.55 | $2,969.26 | $12,538.17 |
| F. and Geraldine Walker | 20,216.35 | 11,145.05 | —— |
| J. D. and Una Holman | 15,505.80 | .69 | —— |
| B. R. and Winifred Slight | 5,202.53 | —— | —— |

Respondent and petitioners agree that Casner did not receive dividend income of $12,538.17 from Casner Industries, Inc. in 1964, and that Walker did not receive dividend income of $11,145.05 from "Marfa" in 1964. These items are no longer in the case.

## II

### THE LAW

 We are required to review the decision of the Tax Court in the same manner and to the same extent as decisions of the District Court in civil ac-

tions tried before the judge and with a jury. Section 7482, Title 26, U.S.C.A. (Internal Revenue Code of 1954). Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A., provides that findings by the trial court shall not be set aside "unless clearly erroneous". "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Company, et al., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Nevertheless, obeisance to the "clearly erroneous rule" must yield when the facts are undisputed and we are then called upon to apply reason and interpretation, American National Bank of Austin v. United States, 5 Cir., 1970, 421 F.2d 442, 451. Therefore, since this case hinges on the legal characterization for federal tax purposes of the transactions between the parties, and since the legal characterization of the transactions between the parties is not a question of fact but rather one of law (Waterman Steamship Corporation v. Commissioner of Internal Revenue, 5 Cir., 1970, 430 F.2d 1185, 1192, cert. denied 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219), the Tax Court's decision relative to this case is not to be garrisoned by the clearly erroneous rule. American National Bank of Austin v. United States, *supra*. It is incumbent upon this Court to apply the law to the undisputed facts. The Tax Court's legal conclusion that the distributions here were dividends and not part of the purchase price has the ring of persuasiveness but does not tie the hands of this Court if it reaches a different conclusion.

In our consideration of the questions to be presented by this appeal, we are concerned with the proper application of the Internal Revenue statutes dealing with dividends and capital gains. Section 61(a) (7), Title 26, U.S.C. (Internal Revenue Code 1954) states that "except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including dividends". Section 316(a), Title 26 U.S.C. (Internal Revenue Code 1954) defines a dividend as any distribution of property made by a corporation to its shareholders out of the earnings and profits. "The statutory concept of dividend is a distribution out of earnings and profits, and normally it is proportionate to shares and leaves the shareholder holding his shares as his capital investment", Zenz v. Quinlivan, 6 Cir., 1954, 213 F.2d 914, 917. On the other hand, "the basic precept underlying the capital gains theory of taxation is the concept that a person who has developed an enterprise in which earnings have been accumulated over a period of years should not be required to expend the ordinary income tax rate in the one year when he withdraws from his enterprise and realizes his gain", Zenz v. Quinlivan, *supra*.

Out of the numerous cases which have been focused upon financial transactions between corporations and their shareholders, there has evolved a body of law which has given vitality to the taxing statutes under consideration and which greatly aid courts in their proper application to factual situations.

■ "This Court, is well aware, as was the Tax Court, that a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits", Rupe Investment Corporation v. Commissioner of Internal Revenue, 5 Cir., 1959, 266 F.2d 624, 629. But the incidence of taxation, depends upon the substance of a transaction, Commissioner of Internal Revenue v. Court Holding Company, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); Kanawha Gas and Utilities Company v. Commissioner of Internal Revenue, 5 Cir., 1954, 214 F.2d 685, 691; Redwing Carriers, Inc. v. Tomlinson, 5 Cir., 1968, 399 F.2d 652, 658; Waterman Steamship Corporation v. Commissioner of Internal Revenue, *supra*.

"Both the Supreme Court and our Court have on numerous occasions stated

that when the realities of a transaction differ from its paper shell, the Internal Revenue Service and the courts may open the shell and look inside to determine the substance of the transaction", Redwing Carriers, Inc. v. Tomlinson, *supra*.

Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), established the landmark principle that tax consequences must turn upon the economic substance of the transaction. In this decision the Supreme Court refused to give effect to corporate transactions which complied precisely with the formal requirements for nontaxable corporate reorganizations, but did so on the ground that the transactions had served no function other than that of a contrivance to bail out corporate earnings to the sole stockholder. Many other Supreme Court decisions have based their application of taxing statutes on the principle established by *Gregory*.

In Commissioner of Internal Revenue v. Court Holding Company, *supra*, the Supreme Court taxed a corporation on the gain from the sale of an apartment house notwithstanding a transfer of the house to the corporation's two shareholders before the sale, since it found that the transfer was made solely to set in a more favorable tax form a sale which in reality was made by the corporation.

Similarly, in Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940), the Supreme Court taxed a trust grantor on the income of the trust property since the formal transfer of the property by the grantor was lacking in substance.

This Court has also recognized the important principle that evolved from the Supreme Court's decision in Gregory. In the decision of United States v. General Geophysical Company, 5 Cir. 1961, 296 F.2d 86, 87, this Court stated as follows:

"The solution of hard tax cases requires something more than the easy generalization that the substance rather than the form of a transaction is determinative of its tax effect, since in numerous situations the form by which a transaction is effected does influence or control its tax consequences. This generalization does, however, reflect the truth that courts will, on occasion, look beyond the superficial formalities of a transaction to determine the proper tax treatment."

Similarly, this Court in Waterman Steamship Corporation v. Commissioner of Internal Revenue, *supra*, stated as follows:

"But the solution of hard tax cases requires something more than the easy generalization that the substance rather than the form of a transaction is determinative of its tax effect. *Gregory* should not be considered a 'talisman of magical powers', since in numerous situations the form by which a transaction is effected does influence or control its tax consequences, Edwards v. Commissioner [of Internal Revenue], 10 Cir., 1969, 415 F.2d 578. This generalization does, however, reflect the truth that courts will look beyond the superficial formalities of a transaction to determine the proper tax treatment."

And in Blackstone Realty Company v. Commissioner of Internal Revenue, 5 Cir. 1968, 398 F.2d 991, 996, and in Redwing Carriers, Inc. v. Tomlinson, *supra*, this Court stated:

"Our income tax law is premised on fact and not fiction. A transaction is analyzed for its pragmatic realities. Although a taxpayer is free to negotiate a contract with an intent to avoid or minimize taxes, such benefit cannot be awarded to Blackstone Realty in the absence of negotiations for prices and values. The intention to avoid or minimize taxes, beneficent as it is, cannot be employed where the end product is a mere subterfuge."

And finally in Waterman Steamship Corporation v. Commissioner of Internal Revenue, *supra*, this Court stated:

"Taxation is transactional and not cuneiform. * * * A taxpayer may engineer his transactions to minimize taxes, but he cannot make a transac-

tion to be what it is not. Documents record transactions, but they do not always become the sole criterion for transactional analysis."

■ The Courts realize that if they permit the true nature of a transaction to be disguised by mere formalisms which exist solely to alter tax liabilities, serious impairment to the effective administration of the tax policies of Congress could result, Commissioner of Internal Revenue v. Court Holding Company, *supra*. Therefore, in cases where the legal characterization of economic facts is decisive, the principle is well established that tax consequences should be determined by the economic substance of the transaction, and not by the labels put upon it for tax avoidance purposes. In the field of taxation administrators and the courts are concerned with substance and realities.

■ Equally well established is the corollary that an integrated transaction may not be separated into its components for the purposes of taxation by either the Internal Revenue Service or the taxpayer. In Kanawha Gas & Utilities Company v. Commissioner of Internal Revenue, *supra*, our Court said:

"In determining the incidence of taxation, we must look through form and search out the substance of a transaction. * * * This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation. The series of closely related steps in such a plan are merely the means by which to carry out the plan and will not be separated."

This Court has similarly also stated the principle that an integrated transaction may not be separated into its components for the purposes of taxation by either the Internal Revenue Service or the taxpayer, Waterman Steamship Corporation v. Commissioner of Internal Revenue, *supra*, and Redwing Carriers, Inc. v. Tomlinson, *supra*. In *Redwing Carriers*, we held that what was in substance a tax free exchange could not be transformed into two sales by the arbitrary separation of time and exchange of cash.

Also, helpful to the determination of the proper application of the taxing statutes to the questions presented by this appeal is the decision of the Sixth Circuit in Steel Improvement and Forge Company v. Commissioner of Internal Revenue, 6 Cir., 1963, 314 F.2d 96, and this Court's decision in Waterman Steamship Corporation v. Commissioner of Internal Revenue, *supra*. These decisions, though factually dissimilar from the present transaction under consideration, demonstrate the law that we believe to be dispositive of this case.

Messrs. Casner and Slight urged the Tax Court to follow Steel Improvement and Forge Company v. Commissioner of Internal Revenue, *supra*, reversing 36 T.C. 265 (1961), and other cases cited therein. However, the Court refused to apply the holding of the Sixth Circuit in *Steel Improvement and Forge Company*. The Tax Court believed that the holding of the Sixth Circuit was distinguishable from the immediate case in several respects. The Court stated:

"First, in our case the directors of Marfa and Alpine apparently did not intend to include the distributions as part of the purchase price. To the contrary, they appear to have intended expressly to exclude the amount of the distributions from the computation of the selling price of the shares, which was book value. Specifically, the directors of Marfa and Alpine declared the dividends on March 26 and 27, 1964. According to the minutes of the director's meetings the date for determination of the book values of the shares of both corporations was not until March 31, 1964.

"A second distinction is that in our case four of the six recipients of the dividend distributions were not sell-

ing any shares. Consequently, it is totally inconsistent with the facts of this case to contend that the distributions represented portions of the purchase price of Casner's and Slight's shares.

"As a third distinction, in the instant case beneficial ownership of the stock of Marfa and Alpine remained with the original owners at the time the dividends were declared on March 26 and 27, 1964, respectively, to shareholders of record on those dates. The minutes of the director's meetings specifically stated the transfers of stock would not be effective until March 31, 1964. On this date Casner and Slight would resign as directors."

In Steel Improvement and Forge Company v. Commissioner of Internal Revenue, *supra*, the Court was faced with the following factual situation. Steel Improvement and Forge Company contracted to sell its fully owned Canadian subsidiary, Canadian Steel Improvement, Ltd., to High Duty Allays of Canada. Under the sales contract, petitioners could receive from its subsidiary a dividend of $180,000 (less Canadian withholding tax) prior to the transfer of the stock. The sales contract price would be increased by the difference between the dividend and $180,000, but not to exceed $64,000. Also, a further condition was the repayment to Steel Improvement and Forge Company of a $150,000 loan owing to it. On April 15, 1954, the Board of Directors of Canadian Steel Improvement, Ltd., authorized repayment of the $150,000 loan above mentioned and declared a dividend of $11.60 per share payable to the April 14th shareholders of record, less the Canadian withholding tax in respect thereof. At that meeting, one director's resignation was accepted and a Hawker Siddley nominee was elected director in his place; otherwise, the composition of the Board was not altered during the period in question. This dividend, in the amount of $116,000, less the 5% Canadian withholding tax in the amount of $5,800, was paid to Steel Improvement and Forge

Company on April 20, 1954, and it was that payment which gave rise to the litigation. On April 21, 1954, Steel Improvement and Forge Company delivered the certificates for all outstanding Canadian Steel stock to High Duty Allays and received its check for $634,000. Thereafter, Steel Improvement and Forge Company had no further control of Canadian Steel, direct or indirect.

Steel Improvement and Forge Company filed its federal income tax return for the fiscal year ending September 30, 1954, at the Internal Revenue Office at Cleveland, Ohio, and reported as income from dividends and long-term capital gains a total amount of $117,735. The Commissioner of Internal Revenue determined the existence of a deficiency in the amount of $33,368.19 on the theory that the entire amount of the dividend constituted ordinary income to Steel Improvement and Forge Company. Steel Improvement and Forge Company then sought a redetermination of that deficiency in the Tax Court of the United States. That Court subsequently entered its affirmance and determined the existence of a deficiency in the amount assessed by the Commissioner. On appeal from the Tax Court's decision, Steel Improvement and Forge Company contended that even though the payment was in the form of a dividend, it was necessary to look behind the surface of the transaction to determine its true character, and that such examination discloses that in substance the payment was actually a part of the purchase price.

In its final determination of the appeal by Steel Improvement and Forge Company from the Tax Court's decision, the Court of Appeals for the Sixth Circuit concluded:

"It is true that a sum paid in the form of dividends resulting in purchase price reductions by varying formulae was in each of these cases held not taxable as ordinary income, but subsequent to sale the stock was retained as security for the balance of the purchase price by the seller. Here, however, the petitioner retained

full control and ownership of the subsidiary and caused distribution to be made to itself, and simply excluded the amount of the dividend from the purchase price. On the basis of this distinction the Tax Court, after a detailed review of these cases, found them to be without application, but we find ourselves unable to share that view. Rather, we incline to the position taken by the dissenting member of the Tax Court and conclude that the disputed dividend is properly taxable as ordinary income to the party having beneficial ownership of the stock at the time when the dividend is established, it being that party who bears the operating risks of the business and stands to benefit from profits or suffer detriment from losses.

"This conclusion seems particularly appropriate under the facts of the present case, wherein it clearly appears from the record of the negotiations that the parties considered the $116,-000 at issue to be part of the purchase price. In those negotiations petitioner said it must realize $900,000, purchaser made a direct payment to petitioner of $634,000 and, in effect, made arrangements for payment of a balance by checks for $150,000 and for $116,-000. The fact that the latter was in the technical form of a dividend does not alter the fact that it constituted a portion of the $900,000 purchase price arrived at by negotiation. Thus, looking behind the technical form to determine the substance, we conclude that like the rest of the $784,000, the $116,000 was a part of the purchase price demanded and received by the petitioner, and is accordingly taxable as a capital gain rather than as ordinary income."

The issue for decision before this Court in Waterman Steamship Corporation v. Commissioner of Internal Revenue, *supra*, was whether the declaration and payment, in the form of a promissory note, of $2,799,820 by Pan Atlantic Steamship Corporation to its parent, Waterman Steamship Corporation, was a tax-free, intercompany dividend, as the Tax Court concluded? 50 T.C. 650. Or whether it was part of the purchase price paid to Waterman in a sale by Waterman of the stock of Pan Atlantic and Gulf Florida Terminal Company to McLean Securities as the Commission contends? If the payment was to be accorded dividend status then Waterman (because Waterman, Pan Atlantic, and Gulf Florida filed consolidated tax returns) would be permitted to eliminate from income the dividends. Internal Revenue Code of 1954, §§ 1501–1504. If on the other hand, the payment was considered to be a part of the purchase price paid to Waterman, the payment would be included in Waterman's gross income as taxable income and the tax on the gain from the sale would be governed by §§ 1001 and 1002 of the Internal Revenue Code of 1954. The Tax Court, with four judges dissenting, held that the note reflected a true dividend and was not part of the purchase price. The Tax Court's decision was predicated on the dividend distribution having been declared and paid to Waterman before the equitable, beneficial, or legal ownership of the stock had passed to the purchaser. The Commissioner of Internal Revenue appealed that decision.

Simplified, the facts in the *Waterman Steamship Corporation* case are that Waterman Steamship Corporation received on December 20, 1954, a written offer from one McLean to purchase the stock of two of Waterman's subsidiaries for $3,500,000. Waterman Steamship Corporation refused McLean's offer on December 23, 1954, but made a counteroffer to sell him the stock for $700,000 after one of the subsidiaries declared Waterman Steamship Corporation a $2,-800,000 dividend. McLean accepted this counteroffer. On the morning of January 21, 1955, McLean's attorney went to the office of Waterman's general counsel to review the proposed purchase agreement prepared by Waterman Steamship Corporation. At the same time, Waterman Steamship Corporation's general counsel reviewed the proposed trust

agreement prepared by McLean's attorney. At noon on January 21, 1955, the Board of Directors of Pan Atlantic met and declared a dividend of $2,799,820 to its stockholders of record on January 20. Since Pan Atlantic did not have available sufficient cash to pay the dividend, the dividend was declared in the form of a promissory note in the amount of $2,799,820. The dividends were paid by the execution and delivery of the note. One hour later Waterman Steamship Corporation sold McLean the entire stock of both subsidiaries for $700,000. The subsidiary declaring the dividend then borrowed $2,500,000 from McLean personally and $299,820 from McLean Securities Corporation. The subsidiary then issued a check to Waterman Steamship Corporation for $2,799,820 in payment of the note Pan Atlantic had issued to Waterman for the dividend.

Waterman Steamship Corporation in its consolidated income tax return, eliminated from income the $2,799,820 received as a dividend from Pan Atlantic and reported $700,180, as the sales price for the stock of the two subsidiaries. Since Waterman Steamship Corporation's tax basis for the stock totalled $700,180, no taxable gain was realized on the sale. The Commissioner, however, determined that Waterman had realized a long-term capital gain of $2,799,820 on the sale of the stock and increased its taxable income accordingly. Waterman petitioned the Tax Court for a redetermination. As previously stated, after reviewing the chain of events leading to the purchase agreement of January 21 and the inferences to be drawn, the Court held that the note paid to Waterman by Pan Atlantic before the sale of the stock was properly deducted as a tax-exempt inter-corporate dividend.

On appeal from the Tax Court's decision to this Court, the Commissioner took the position that the Tax Court's conclusions were inconsistent with the Court's own findings and were contrary to the principle that tax consequences are to be governed by the substance not the form of the transactions. The Com-

missioner argued that the Tax Court resolved the question presented by Waterman Steamship Corporation v. Commissioner of Internal Revenue by applying rules applicable to situations where a regular dividend had concededly been declared and the only issue was who was to be taxed. Those rules, the Commissioner contended, are not applicable when the parties contemplate that a purported dividend is to be inextricably tied to the purchase price and where, as here, the amount of the dividend is not a true distribution of corporate profits. This Court agreed with the Commissioner and reversed the decision of the Tax Court, concluding that the undisputed facts would not support a holding that Waterman Steamship Corporation received what in tax terms should be described functionally as a dividend from Pan Atlantic. This Court relied on the Supreme Court decision in Gregory v. Helvering, *supra,* which established the principle that tax consequences must turn upon the economic substance of a transaction and not upon the time sequences or form of the transaction.

### III

### THE ISSUES

The important questions raised by this appeal include:

1. Relative to the cash distributions from the paid-in capital surplus accounts of "Alpine" and "Marfa" made to the selling stockholders, J. E. Casner and B. R. Slight, did such cash distributions constitute to them taxable dividends under the mandates of § 61(a)(7) and § 316(a) of the Internal Revenue Code of 1954, or did such cash distributions to the selling stockholders constitute in fact a part of the purchase price paid to them for their stockholdings and therefore subject to taxation under the capital gains provisions of the Internal Revenue Code of 1954?

2. If the Court should find that the cash distributions from the paid-

in capital surplus accounts of "Alpine" and "Marfa" made to the selling stockholders constituted in fact a part of the purchase price paid to them for their stockholdings, did such cash distribution therefore result in taxable dividends to the buying stockholders under the mandates of § 61(a) (7) and § 316(a) of the Internal Revenue Code of 1954?

3. Relative to the cash distributions from the paid-in capital surplus accounts of "Alpine" and "Marfa" made directly to the buying stockholders and thereafter paid by the buying stockholders to the selling stockholders, did such cash distributions result in ordinary income under the mandates of § 61 (a) (7) and § 316(a)?

The basic factual background in this case reveals two groups of stockholders, one group buying and the other selling. The selling stockholders, J. E. Casner and B. R. Slight, and the buying stockholders, Forrest Walker and J. D. Holman, agreed to sell and buy, respectively, stock in two General Motors dealership corporations. The dealership agreements provided, and all parties agreed, that the corporations had the right to buy the stock at book value.

When the agreements to buy and sell were made, Casner stated that he would like to receive as much cash as possible for his stock because he would no longer have an interest in either corporation. The details of formalizing the sale were turned over to the accountant, Kenneth Otto, who did the work in May of 1964, simultaneously having (1) checks issued by the corporations to distribute their paid-in capital surplus pro-rata to the stockholders, (2) the buying stockholders pay over to Casner their receipts plus personal notes and assets, (3) the selling stockholders endorsed their stock to the buyers, and (4) minutes of directors and shareholders meetings were prepared and backdated to March, 1964, the true date of the agreements. Also, Mr. Casner agreed to and did purchase

from "Alpine" a mortgage note from Alpine Butane Company and a 1964 Cadillac car. Mr. Slight agreed to and did purchase from "Alpine" a 1964 Chevrolet. The purposes of these transactions, forming the plan designed by the accountant, were to eliminate Casner and Slight from the two corporations, to insure that Casner would receive as much cash as possible from the sale of his stock, to get cash to the buying stockholders, and to prevent the complete depletion of the two corporations' available cash.

On their federal income tax returns the selling stockholders, J. E. Casner and B. R. Slight, included the amounts received by them from the two corporations as part of the sales proceeds from the sale of their stock. The buying stockholders, Forrest Walker and J. D. Holman, did not report on their federal income tax returns the amounts received by them from the two corporations.

The Commissioner of Internal Revenue issued statutory notices of deficiency to both buyers and sellers stating that as a result of the cash distributions they received taxable dividends in the year 1964 which were not reported.

Hence the tax consequences of the cash distributions made by the corporations to the stockholders are at issue.

In applying the law to the facts, the Tax Court, in its opinion, held that the distributions to the two stockholders were dividends and taxable as such to each recipient stockholder in the amount received.

In reaching its decision the Tax Court reasoned that the directors intended to exclude the amount of the cash distributions from the computation of the selling price. The directors declared the dividends on March 26 and 27, 1964, and, according to the minutes of the directors meeting, the date for determination of the book values of the shares of both corporations was not until March 31, 1964. Therefore, the Tax Court concluded that the beneficial ownership of the stock remained with the selling stock-

holders at the time the distributions were declared and that it was totally inconsistent with the facts to contend that the distributions represented portions of the purchase price.

The question initially here presented is whether the cash distribution from the paid-in capital surplus accounts of "Alpine" and "Marfa" made to the selling stockholders, J. E. Casner and B. R. Slight, constituted taxable dividends to the selling stockholders under the mandates of §§ 61(a) (7) and 316(a) of the Internal Revenue Code of 1954, or whether such cash distributions to the selling stockholders constituted in fact a part of the purchase price to the selling stockholders for their stockholdings and therefore subject to the capital gains provisions of the Internal Revenue Code.

Importantly, the facts of this case disclose that the price at which J. E. Casner and B. R. Slight were to sell was fixed at book value *including paid-in capital surplus*. Appellants, Forrest Walker and J. D. Holman so testified at the trial; as did the certified public accountant, who was familiar with the agreement among the parties and who handled the formalities of the sale. The buying stockholders' testimony is entitled to belief for they were testifying adverse to their interests. The parties also agreed in March, 1964, that J. E. Casner was to be paid as much cash as possible and that cash in the corporation would be utilized for this purpose since it was anticipated that the buying stockholders would lack sufficient cash. The details of formalizing the sale were turned over to a certified public accountant who did the work in May, 1964. Mindful of the instructions to him to eliminate J. E. Casner and B. R. Slight completely from the two corporations, to insure that J. E. Casner would receive as much cash as possible from the sale of his stock, to get cash to the buying stockholders for the purchase of the stock owned by the selling stockholders, and to not completely deplete the two corporations' available cash, the accountant formalized a multistep plan to accomplish the sale of the stock owned by J. E. Casner and B. R. Slight to the buying stockholders, Forrest Walker and J. D. Holman. This plan was followed by the parties and included the following steps:

1. The amount recorded on the books of "Alpine" and "Marfa" as paid-in capital surplus was distributed pro rata by the respective corporations to their stockholders by checks of the corporations dated May 27, 1964, and May 28, 1964.

2. Contemporaneously with the pro rata distributions of "Alpine" and "Marfa", the following transactions occurred:

 (a) Walker acquired from Casner 1909 shares of "Alpine" and 2500 shares of "Marfa". The "Alpine" shares had a book value of $32,669.87 and the "Marfa" shares had a book value of $31,727.91. Walker issued a check on June 3, 1964, for $19,072.78 (almost all of his cash distribution) and transferred a secured note receivable for the balance.

 (b) Holman acquired 1222 shares of "Marfa" from Casner at its book value of $15,505.80. Holman endorsed to Casner his distribution check from "Alpine". The check was for the amount of $15,505.80. Holman also received gratuitously from Casner 2426 shares of "Marfa" stock. The book value of the 2426 shares was $30,788.77.

 (c) Herbert Harlow acquired from Casner 2500 shares of "Marfa" stock with a book value of $31,727.91. He issued a promissory note to Casner for that same amount.

 (d) Kenneth Stucke acquired 1822 shares of "Alpine" from Casner at their book value of

$31,180.99. Stucke gave Casner his check on June 3, 1964, for $1,180.99, and executed a promissory note for the balance of $30,000.

(e) Slight transferred to Stucke his 920 shares in "Alpine" at the book value of $15,744.51. Stucke paid $744.51 cash and issued a promissory note for the balance to Slight in the amount of $15,000.

(f) Casner purchased from "Alpine" a mortgage note of Alpine Butane Company for $19,500 and an automobile for $4,900.

(g) B. R. Slight purchased from "Alpine" a 1964 Chevrolet for $3,000.

Within the above multi-step plan designed for the stock sale transaction, involving the stock owned by J. E. Casner and B. R. Slight, it is the cash distribution step of the plan which gives rise to this present litigation and the initial question presented by this appeal.

The Tax Court's conclusion that the appellants, J. E. Casner and B. R. Slight, were in substance both the legal and beneficial owners of the stock when the dividend was declared does not answer the question whether *in substance* a dividend was declared in regard to the appellants.

The Commissioner contends that notwithstanding the stock sale transaction the selling stockholders received taxable dividends upon the pro rata distribution of cash by "Alpine" and "Marfa". The selling stockholders on this appeal contend that the distributions were payments on the sale price of their stock and taxable only as capital gains. Also, the selling stockholders contend that the Tax Court erroneously sanctioned the form of a cash distribution coupled with a stock transfer in complete disregard of the teachings of this and other Courts of Appeals that the substance of such a transaction is controlling.

IV

THE DECISION

Based on the body of law, that has evolved from the numerous cases which have focused upon financial transactions between corporations and their stockholders, and based upon the decisions in Steel Improvement and Forge Company v. Commissioner of Internal Revenue, *supra*, and Waterman Steamship Corporation v. Commissioner of Internal Revenue, *supra*, we hold that the Tax Court erroneously found that the cash distributions to the selling stockholders constituted taxable dividends to the selling stockholders under the mandates of §§ 61(a) (7) and 316(a). We hold that such cash distributions to the selling stockholders, J. E. Casner and B. R. Slight, constituted in fact a part of the purchase price for their stock sold to the buying stockholders, Forrest Walker and J. D. Holman.

■■ This Court is well aware, as was the Tax Court, that a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, Rupe Investment Corporation v. Commissioner of Internal Revenue, *supra;* Gregory v. Helvering, *supra*. But this Court is also aware that the intention to avoid or minimize taxes, beneficent as it is, cannot be employed where the end product is a mere sham or subterfuge, Blackstone Realty Company v. Commissioner of Internal Revenue, *supra;* Redwing Carriers, Inc. v. Tomlinson, *supra*. Therefore, in cases where the legal characterization of economic facts is decisive, the principle is well established that the tax consequences should be determined by the economic substance of the transaction, not the labels put on it for property law or tax avoidance purposes, Union Planters National Bank of Memphis v. United States, 6 Cir., 1970, 426 F.2d 115, 118. To permit the true nature of a transaction to be disguised by mere formalisms which exist solely to alter tax liabilities,

would seriously impair the effective administration of the tax policies of Congress, Commissioner of Internal Revenue v. Court Holding Company, *supra*.

Both the Supreme Court and our Court, on numerous occasions, in their consideration of transactions between corporations and shareholders have held that when the realities of a transaction differ from its paper shell, the Internal Revenue Service and the Courts may open the shell and look inside to determine the substance of the transaction.

In Gregory v. Helvering, *supra,* the Supreme Court established the landmark principle that tax consequences must turn upon the economic substance of a transaction. In this decision, the Supreme Court refused to give effect to corporate transactions which complied precisely with the formal requirements for nontaxable corporate reorganizations on the ground that the transactions had served no function other than that of a contrivance to bail out corporate earnings to the sole stockholder. Many other Supreme Court decisions have based their application of taxing statutes on the principle established by the Gregory v. Helvering decision, Commissioner of Internal Revenue v. Court Holding Company, *supra*; Helvering v. Clifford, *supra.*

This Court has also recognized the important principle that evolved from the Supreme Court's decision in Gregory v. Helvering. In the decision of United States v. General Geophysical Company, *supra,* this Court stated as follows:

"The solution of hard tax cases requires something more than the easy generalization that the substance rather than the form of a transaction is determinative of its tax effect, since in numerous situations the form by which a transaction is effected does influence or control its tax consequences. This generalization does, however, reflect the truth that courts will, on occasion, look beyond the superficial formalities of a transaction

to determine the proper tax treatment."

Similarly, this Court in Waterman Steamship Corporation v. Commissioner of Internal Revenue, *supra,* stated as follows:

"But the solution of hard tax cases requires something more than the easy generalization that the substance rather than the form of a transaction is determinative of its tax effect. *Gregory* should not be considered a 'talisman of magical powers' since in numerous situations the form by which a transaction is effected does influence or control its tax consequences. Edwards v. Commissioner [of Internal Revenue], 10 Cir. 1969, 415 F.2d 578. This generalization does, however, reflect the truth that Courts will look beyond the superficial formalities of a transaction to determine the proper tax treatment."

In Blackstone Realty Company v. Commissioner of Internal Revenue, *supra,* and in Redwing Carriers, Inc. v. Tomlinson, *supra,* this Court stated:

"Our income tax law is premised on fact and not fiction. A transaction is analyzed for its pragmatic realities."

And finally in Waterman Steamship Corporation v. Commissioner of Internal Revenue, *supra,* this Court stated:

"Taxation is transactional and not cuneiform. * * * A taxpayer may engineer his transaction to minimize taxes, but he cannot make a transaction appear to be what it is not. Documents record transactions, but they do not always become the sole criterion for transactional analysis."

Equally well established in our courts is the corollary that an integrated transaction may not be separated into its components for the purposes of taxation by either the Internal Revenue Service or the taxpayer. In Kanawha Gas & Utilities Company v. Commissioner of Internal Revenue, *supra,* our Court said:

"In determining the incidence of taxation, we must look through form

and search out the substance of a transaction. * * * This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation. The series of closely related steps in such a plan are merely the means by which to carry out the plan and will not be separated."

This Court has similarly stated the above principle that an integrated transaction may not be separated into its components for the purposes of taxation by either the Internal Revenue Service or the taxpayer in Waterman Steamship Corporation v. Commissioner of Internal Revenue, *supra,* and Redwing Carriers, Inc. v. Tomlinson, *supra.*

■ Guided by the landmark principle that courts may look beyond the superficial formalities of a transaction, and based upon the well established corollary that in cases involving a series of transactions and executed as parts of a unitary plan to achieve an intended result, such plans shall be viewed as a whole regardless of whether the effect of so doing is the imposition of or relief from taxation, this Court agrees with the appellants, J. E. Casner and B. R. Slight, that the cash distribution or so-called dividend to them and the sale of stock were one transaction based upon a pre-conceived multi-step plan for the sale of stock by the selling stockholders, J. E. Casner and B. R. Slight, to the buying stockholders Forrest Walker and J. D. Holman, for as much cash as possible. It is readily apparent from the record and the findings of fact that the true substance, purpose, and effect of the multi-step plan designed by the hired accountant was that the selling stockholders would sell all of their stock and be completely eliminated from the business of the two corporations, and the buying stockholders would buy the selling stockholders' stock. The cash distribution or so-called dividend was but one transitory step in the total pre-arranged plan to accomplish the sale of the stock by the selling stockholders and the purchase of such stock by the buying stockholders. As one step in the multi-step plan for the sale of the stock owned by the selling stockholders to the buying stockholders, it was the function of the cash distribution or so-called dividend from the paid-in capital surplus accounts of the two corporations made to the stockholders to decrease the book value of the stock and give to the buying stockholders more cash which they agreed as a part of the multi-step plan to use to purchase the selling stockholders' stock. Without such step, no sale could have been accomplished for it was anticipated that the buying stockholders would not have available sufficient cash to meet the conditions for sale established by Casner requiring as much cash as possible in exchange for his stock. Also, there is no evidence to show that the corporation would have distributed its cash surplus *but for the contemplated stock sale.*

■ Thus, looking through the form of the transaction to its economic substance, we are of the view that the cash distributions to the selling stockholders were not essentially equivalent to the distribution of a taxable dividend to them. We are convinced that such cash distributions to the selling stockholders constituted in fact, and in accordance with the pre-conceived multi-step plan, a part of the purchase price to be paid to the selling stockholders for their stockholdings. Appellants, J. E. Casner and B. R. Slight, in fact and in accordance with the multi-step plan designed by the hired accountant, divested themselves of all of their stock. The cash they received can only be considered as part of the purchase price thereof and hence subject to taxation as capital gains and not as ordinary income from the distribution of cash dividends.

In reaching our decision that the cash distributions to the selling stockholders

constituted in fact a part of the purchase price paid to them for their shares and that such cash distributions did not constitute taxable cash dividends to the selling stockholders, we note with interest the position of the Commissioner in *Waterman Steamship Corporation:*

"The Commissioner did not argue that the legal or equitable ownership of the stock had passed from Waterman to Securities before the declaration or payment of the dividend on January 21. Rather, the Commissioner adopted the position that irrespective of the form of the transaction, the substance of the transaction was a payment by Securities to Waterman of $3,500,000 for the stock of the subsidiaries. The entire procedure, the Commissioner contended, was a mere device designed to give the appearance of a dividend to a part of the purchase price of the stock, and that no purpose was served by causing a part of the purchase price of the stock to be labeled a 'dividend' except the avoidance of an income tax by Waterman.

The above position of the Commissioner was accepted by the Court in *Waterman Steamship Corporation* as the Court looked through the technical form of the transaction to its economic substance. In the immediate case, the Commissioner argues that the legal, equitable, and beneficial ownership of the stock remained in the selling stockholders at the time of the cash distribution and therefore constituted to them cash dividends, notwithstanding the stock sale. It can be readily seen that the position of the Commissioner in the immediate case is inconsistent with the position he took in *Waterman Steamship Corporation.* Seemingly, this inconsistency between the Commissioner's position in this case and his position in *Waterman Steamship Corporation* evidences a tendency to rely on "substance" when beneficial to the revenues or to rely on "form" when more beneficial to the revenues. In any event, this approach cannot be accepted. The economic substance of a transaction should generally be decisive of its tax consequences to the taxpayer.

Question two presented by this appeal is as follows:

Assuming that the cash distributions from the paid-in capital surplus of "Alpine" and "Marfa" made to the selling stockholders constituted in fact a part of the purchase price paid to them for their stockholdings, did such cash distributions therefore result in ordinary income to the buying stockholders under the mandates of §§ 61 (a) (7) and 316(a)?

We agree with the Commissioner that the cash distributions made by the two corporations in this case constituted taxable dividends. Also, we agree with the Commissioner that such cash distributions or dividends by a corporation are inexorably income to the beneficial owners of the shares at the time the cash distributions or dividends were established.

In the instant case, both the selling stockholders and the buying stockholders have denied tax liability for the cash distributions from the paid-in capital surplus accounts of "Alpine" and "Marfa" made to the selling stockholders. However, this Court recognizes that the selling stockholders and the buying stockholders cannot so manipulate their transactions or so frame their transactions as to result in the dividend disappearing with no one taxable for the receipt of the cash dividends or cash distributions. Under the statute, the cash dividends or cash distributions are inexorably someone's income.

Having previously determined that the cash distributions from the paid-in capital surplus accounts of "Alpine" and "Marfa" made to the selling stockholders constituted in fact a part of the purchase price paid to them for their stock, it is the determination of this Court that the buying stockholders, Forrest Walker and J. D. Holman, received taxable dividends in regard to the cash distributions made to the selling stockholders by the two corporations since they received the

economic benefit from the cash distributions. As a result of such cash distributions and in accordance with the pre-conceived multi-step plan for the sale of the stock, the book value of the stock purchased by the buying stockholders was reduced. Certainly, such reduction in the book value of the stock by the utilization of corporate funds represented a true economic benefit received by the buying stockholders, and thereby resulted in the constructive receipt of taxable dividends by the buying stockholders.

We also hold that the cash distributions to the selling stockholders constituted taxable dividends to the buying stockholders because they had at the time of the dividend established the beneficial ownership of the stock, notwithstanding the fact that the selling stockholders retained full control and ownership of the stock. At the cash distribution step in the multi-step plan designed for the sale of the stock owned by the selling stockholders, J. E. Casner and B. R. Slight, it was the buying stockholders, Forrest Walker and J. D. Holman, who shared the operating risks of the two corporations and who stood to benefit from the profits of the corporations or suffer detriment from their losses.

█ We conclude that the cash distributions to the selling stockholders are properly taxable to the buying stockholders, Forrest Walker and J. D. Holman, the beneficial owners of the stock, Steel Improvement and Forge Company v. Commissioner of Internal Revenue, *supra*. This Court's conclusion that the cash distributions to the selling stockholders is properly taxable to the buying stockholders seems particularly appropriate under the facts of the present case, wherein it clearly appears from the record that the parties considered the cash distributions to the selling stockholders to be part of the purchase price for the stock.

The third question presented by this appeal is as follows:

Relative to the cash distributions from the paid-in capital surplus accounts of "Alpine" and "Marfa" made directly to the buying stockholders and thereafter paid by the buying stockholders to the selling stockholders, did such cash distributions result in ordinary income under the mandates of §§ 61(a) (7) and 316(a) of the Internal Revenue Code of 1954?

In our case, the facts reveal that the buying stockholder, Forrest Walker, received a dividend check dated May 27, 1964, from "Alpine" for $20,216.35, and that on June 3, 1964, he issued to J. E. Casner a check for $19,072.78 in part payment of 1,909 shares of "Alpine" stock and 2,500 shares of "Marfa" stock. Also, buying stockholder, J. D. Holman, received a dividend check dated May 27, 1964, from "Alpine" in the amount of $15,505.80 and a dividend check dated May 28, 1964, from "Marfa" in the amount of $.69. Holman endorsed the "Alpine" check over to J. E. Casner.

█ Notwithstanding the fact that the cash distributions to Forrest Walker and J. D. Holman were made from the paid-in or capital surplus accounts of "Alpine" and "Marfa", this Court concludes that the disputed cash distributions made to the buying stockholders, Walker and Holman, constituted taxable dividends to them under the mandates of §§ 61(a) (7) and 316(a) of the Internal Revenue Code of 1954.[1]

1. Our treatment of the cash distributions from the paid-in capital accounts of "Alpine" and "Marfa" and the phrase, "distributions from the paid-in capital surplus accounts of Alpine and Marfa", as used by the parties, the Tax Court, and this Court to describe the named source of the cash distributions, is easily clarified.

The facts stipulated by the parties were:

On January 1, 1964, the capital stock, earned surplus, and paid-in or capital surplus of Alpine amounted to $109,310.-00, $69,310.00, and $62,023.23, respectively. On December 31, 1964, these balances amounted to $109,680.00, $75,980.00, and zero, respectively.

On January 1, 1964, the capital stock, earned surplus and paid-in or capital surplus of Marfa amounted to $100,000.-

Section 316(a) defines a dividend as any distribution of property made by a corporation to its shareholders out of earnings and profits and requires further that all distributions be out of earnings and profits to the extent thereof. Because there were qualifying earnings and profits in the corporations in at least the amount of the distribution in the immediate case, the unqualified mandate of § 316(a) leaves no room for the argument that the cash distributions to Walker and Holman from "Alpine" and "Marfa" should not be treated as taxable dividends. Walker and Holman were the owners of the stock at the time the dividends were established. They were to continue to bear the operating risks of the corporations and they were to continue to benefit from the future profits of the corporations.

Walker and Holman argue that no part of the amount received by them is taxable to them because they received no economic benefit from the cash distributions. However, we conclude that the buying stockholders received the same benefit from the cash distributions as would any other recipient of a dividend distribution. To suggest that the proper test is whether the shareholders are better off economically after the cash distributions than before is incorrect since no dividend distribution enlarges the net worth of the shareholders. A dividend merely transfers part of the value represented by the shareholders ownership interest in the corporation out of corporate solution and into his personal possession, reducing the value of his corporate interest by the same amount received by him and thus leaving his over-all net worth unchanged.

Also, we conclude that the buying stockholders did not act merely as conduits for J. E. Casner relative to the cash distributions that they received from the two corporations. Their post-distribution use of the cash they received from the two corporations to purchase stock from the selling stockholders, J. E. Casner and B. R. Slight, produced the same result as any other use of the funds. It acquired for them value which they would not otherwise have acquired. That a shareholder uses a dividend received by him to buy property from another shareholder does not alter the fact that a dividend has been received.

As to appellants-taxpayers, Forrest Walker and J. D. Holman, we affirm the decision of the Tax Court. As to appellants-taxpayers, J. E. Casner and B. R. Slight, the decision of the Tax Court is reversed.

Affirmed in part and, in part, reversed, as herein indicated, and remanded for further proceedings not inconsistent herewith.

00, $28,983.38, and $3,433.47, respectively. On December 31, 1964, these balances amounted to $100,000.00, $23,992.73, and zero, respectively.

The Tax Court found, also pursuant to stipulation:

On May 27 and May 28, 1964, the paid-in or capital surplus of Alpine and Marfa were distributed pro rata by the respective corporations, with $62,023.23 being distributed by Alpine and $3,433.-47 being distributed by Marfa.

Although the cash distributions to the stockholders were characterized and entered on the books of the two corporations as "distributions from their paid-in or capital surplus", they were made at a time when the corporations had undistributed earnings and profits in excess of such cash distributions. Under the command of § 316(a) we are compelled to agree with the Tax Court that the distributions were taxable dividends under §§ 61(a) (7) and 316(a), despite their characterization on the books as distributions from paid-in or capital surplus. This is true despite the normal rule that any distribution from a paid-in capital surplus account signifies a nontaxable return of capital.