Artemus D. DAVIS and Snead Y. Davis, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 69–407–Civ–J.

United States District Court, M. D. Florida, Jacksonville Division.

Feb. 16, 1972.

---

Robert Francis O'Malley, Miami, Fla., for plaintiffs.

Rodger M. Moore, Atty., Tax Div., United States Dept. of Justice, Washington, D. C., and John L. Briggs, U. S. Atty., Jacksonville, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHARLES R. SCOTT, District Judge.

This action to recover income taxes which the Plaintiffs claim were illegally assessed against them was tried by the Court without a jury. The sole issue is whether the taxable effects of a sale of Plaintiffs' interest in real estate occurred in 1963, as the Plaintiffs claim, or in 1964, as the Defendant claims. From the record and the evidence, the Court makes the following Findings of Fact and Conclusions of Law under Rule 52(a), F.R.C.P.

### FINDINGS OF FACT [1]

1. During the years 1963 and 1964, the Plaintiffs [2] were husband and wife, and they were and are citizens of the United States and resident in Duval County, Florida.

2. The Defendant is the United States of America.

3. The Plaintiffs timely filed their joint Federal income tax returns for the years 1963 and 1964.

4. This action is of a civil nature by the Plaintiffs to recover Federal income taxes for the year 1964 and interest thereon claimed to have been erroneously and illegally assessed and collected in the total amount of $89,873.96, plus interest attributable to said overpayments as provided by law.

5. Upon examination and audit of the Plaintiffs' income tax returns for the years 1963 and 1964, the Internal Revenue Service determined that profit from the sale of the Plaintiff's interest in The Bank of California Building, sometimes hereafter "the Building", should have been included in their 1964, rather than their 1963, income as reported by the Plaintiffs. Other related determinations were made regarding income and expenses resulting from the Defendant's determination as to the effective date of sale, and relating to Section 1245 treatment of gain from sale to the extent of depreciation on elevators allowed after June 30, 1963.

6. The foregoing determinations, together with others no longer in issue in

---

1. Findings 1 through 9 are based on the facts stipulated by the parties in their pretrial stipulation.

2. Snead Y. Davis is a party to this suit only because joint income tax returns were filed by the Plaintiffs for the years 1963 and 1964. The term "Plaintiff", as used hereinafter, shall refer to Artemus D. Davis individually, unless otherwise indicated in the context.

this action, were set forth in a statutory notice of income tax deficiencies dated December 7, 1967.

7. Adjustments were accordingly made based upon the foregoing determinations and, as a result, an income tax deficiency for the year 1964 in the amount of $76,047.84, together with interest in the amount of $13,826.12, was assessed against the Plaintiffs by the Internal Revenue Service, and additional accrued interest in the net amount of $10.66 was thereafter assessed.

8. The foregoing assessments for the year 1964 were paid in full by the Plaintiffs, and a timely claim for refund thereof was thereafter filed by them.

9. That claim for refund was disallowed by the Internal Revenue Service, and this action was subsequently timely commenced.

10. On June 16, 1959, W. R. McIlvaine, a successful and experienced real estate developer (Tr. 15 & 41[3]), and Donald F. Duncan each purchased an undivided half interest in unimproved real property in San Mateo, California (Stip. 5, II(a)[4]). The total purchase price paid for the property was $150,000.00 (Tr. 16).

11. On February 29, 1960, A. D. Davis, hereafter sometimes called "Davis", and sometimes "Plaintiff", purchased Duncan's undivided one-half interest. Thereafter, McIlvaine and Davis continued to own the property for investment and development (Stip. 5, II(b) & Tr. 41).

12. On June 1, 1961, McIlvaine and Davis began construction of an office building containing approximately 29,000 square feet of rentable space on the property [Stip. 6, II(e)].

13. The building was completed May 25, 1962 [Stip. 6, II(f)], and was called The Bank of California Building. The venture was a success, and within a year the building was fully leased (Tr. 23).

14. In about June or July 1963, because of real estate interests in the same area which they owned with others, McIlvaine and Davis determined to sell The Bank of California Building (Tr. 43, 52).

15. McIlvaine did not want to sell his interest in 1963 because, after discussions with his attorney and a tax adviser, he decided it would be to his best interest to sell in 1964 (Tr. 27, 28). Davis, on the other hand, after a review of his financial transactions during 1963 with his tax and financial advisers, was desirous of selling his interest in 1963, since the gain he expected to realize on the sale would be offset by losses incurred during 1963 (Tr. 44, 52). McIlvaine advised Davis that there were several prospects interested in the property (Tr. 27, 36). Davis suggested to McIlvaine that they sell the building during 1963 (Tr. 44). McIlvaine would not consent to a sale of his interest during 1963 (Tr. 44).

16. McIlvaine and Davis had long had an oral understanding that should either party sell his undivided interest, it would be to someone compatible to the other party (Tr. 31, 44, 53).

17. Following the determination of McIlvaine and Davis to sell, several unsolicited offers were received (Tr. 26, 36). On November 19, 1963, Albert L. Petri made an offer, conditioned on acceptance within ten days, of $1,550,000 cash for the Building. This offer expired for lack of acceptance within the ten day period (Jt. Ex. 8).

18. Meanwhile Davis, who had decided he would sell in 1963, was looking for a purchaser for his undivided half interest in the Building who would be compatible with McIlvaine (Tr. 44, 53).

19. Among Davis' business associates was T. W. Bishop, who was president, a director, and owner of one-third of the capital stock of B. B. H., Inc., a Florida

---

3. References to supporting testimony will be shown, for example, as "Tr. 15", which shall mean trial transcript, page 15.

4. References to facts set forth in the pretrial stipulation will be shown, for example, as "Stip. 5, II(a)", which shall mean page 5, paragraph II(a).

corporation formed June 19, 1958. Bishop was an accountant with considerable experience in the handling of real estate. He was a vice president of D. D. I., Inc., a Davis family corporation, and had considerable knowledge of the Davis family affairs, including those with respect to The Bank of California Building. The remaining capital stock of B. B. H., Inc. was held by J. S. Bryan, Jr., who was general counsel for Winn-Dixie Stores, Inc. ("Winn-Dixie"), a corporation of which Davis was president and chairman of the executive committee, and R. J. Head, who was comptroller of Winn-Dixie. Bryan owned one-third of the B. B. H., Inc. stock and Head owned the remaining third. The officers and directors of B. B. H., Inc. were: T. W. Bishop, president, assistant treasurer and director; R. J. Head, vice president, assistant secretary and director; J. S. Bryan, Jr., secretary and treasurer and director; P. F. Arnall, vice president; and H. J. Darrah, assistant secretary and assistant treasurer (Jt. Ex. 9). All of the foregoing, except Bishop, held executive positions in Winn-Dixie. B. B. H., Inc. was an *investment company* whose holdings consisted of real estate, stocks, bonds, and other intangibles (Pl. Ex. 3, Tr. 78).

20. In November 1963, H. J. Darrah and W. R. Anchors, another Winn-Dixie executive, discussed with Bishop the fact that Davis was looking for a buyer for Davis' interest in The Bank of California Building (Tr. 67). Bishop, who from his contact with the Davis family affairs knew the building, details of its operation and background, believed that purchase of Davis' interest might offer an opportunity to make a profit. He expressed interest in the purchase by B. B. H., Inc. (Tr. 67, 68). Bryan and Head approved the purchase (Tr. 98), and determination to make it was made in the latter part of November 1963 (Tr. 70).

21. On December 3, 1963, Petri renewed his original offer of $1,550,000 for the Building (Jt. Ex. 8).

22. Bishop and Bryan were acquainted with McIlvaine (Tr. 35). Davis knew this, was satisfied that, as a purchaser, B. B. H., Inc. would be compatible with McIlvaine (Tr. 45), and was agreeable to the sale to B. B. H., Inc. at the price offered by Petri.

23. On December 6, 1963, B. B. H., Inc. purchased Davis' undivided one-half interest in The Bank of California Building for a total purchase price of $775,000.00, consisting of $325,000.00 cash, plus the assumption of $450,000.00 of the outstanding mortgage amounting to $900,000.00 (Pl. Ex. 2). On that date, Davis executed and delivered a deed conveying his interest in the Building to B. B. H., Inc. The parties agreed that rents and expenses would be prorated as of December 1, 1963 [Stip. 7, II(k)].

24. To obtain the cash to purchase from Davis, B. B. H., Inc. borrowed $325,000 from Volusia Locations, Inc., a real estate and investment company, the stock of which was wholly owned by Davis. To evidence this loan, B. B. H., Inc. gave its promissory note dated December 10, 1963, to Volusia Locations, Inc., payable on demand, and bearing 4½% interest, the then prime commercial rate [Stip. 6, II(1)].

25. Davis was not an *officer, director or shareholder* in B. B. H., Inc., nor did he exercise any control over that corporation's affairs (Tr. 46). He made no promises, nor did he offer any indemnification to B. B. H., Inc. in its transaction with him (Tr. 75, 100). Further, he made no effort to control, or become involved in any way with, the actions of B. B. H., Inc. in its activities with respect to the Building after Davis conveyed his interest in it on December 6, 1963 (Tr. 75).

26. On December 10, 1963, McIlvaine and B. B. H., Inc. accepted Petri's offer to purchase the Building and a formal agreement of sale was entered into on January 10, 1964, calling for an agreed total purchase price of $1,553,150.00. The transaction was closed January 15, 1964 (Pl. Ex. 1). B. B. H., Inc. expected to realize several thousand dollars profit from the rents from the Building;

however, before the closing, a dispute between the sellers and the buyer arose over the date to which rents would be prorated, with the eventual result that, in an amicable settlement of the dispute, B. B. H., Inc. had a minor loss in the entire transaction instead of realizing a profit (Tr. 72, 76). Davis took no part in this dispute, nor did he make good, or offer to make good, the loss of B. B. H., Inc. in the transaction (Tr. 75, 100).

27. Since its formation in 1958, B. B. H., Inc. had made other purchases of properties from corporations controlled by members of the Davis family (Tr. 76). These purchases were made after negotiations and at arm's length (Tr. 77). B. B. H., Inc. had also borrowed substantial sums from corporations controlled by members of the Davis family (Tr. 77), and the aggregate of these loans was well over a million dollars (Tr. 77). It was not unusual for B. B. H., Inc. to borrow funds repeatedly and in large amounts from these corporations. B. B. H., Inc. repaid all of these loans, together with interest, at either the prime rate or the prime rate plus one-half percent (Tr. 78).

28. As of December 31, 1963, in addition to the loan from Volusia Locations, Inc., B. B. H., Inc. also had outstanding loans to Danov Corporation of $330,000.00 and Norata Corp. of $305,000.00 (Pl. Ex. 3). Both corporations were controlled by Davis' brother (Tr. 77).

29. If Petri had not performed, or if the sale to Petri had not closed, B. B. H., Inc. was prepared to hold its interest and operate the building, and the officers of B. B. H., Inc. were well aware of all of the burdens of ownership, including the liability for the mortgage which had been assumed by B. B. H., Inc. (Tr. 72, 106).

30. B. B. H., Inc. reflected the results of its short ownership of an interest in The Bank of California Building for the month of December 1963 on its books and records and in its 1963 Federal income tax return (Jt. Ex. 2 & Tr.

76), and reported the sale of its interest on January 15, 1964, on its 1964 Federal income tax return (Jt. Ex. 2).

31. On January 29, 1964, B. B. H., Inc. repaid its loan of $325,000.00 from Volusia Locations, Inc., together with interest thereon of $2,031.25 [Stip. 7, II(n)].

32. Davis reported a long-term capital gain in the amount of $264,449.68 resulting from the sale to B. B. H., Inc. on his 1963 Federal income tax return (Jt. Ex. 1). Subsequently, the Defendant determined that Davis' sale occurred in 1964, assessed the deficiency described in paragraph 7 against Plaintiffs (Jt. Ex. 3), they paid it, filed a claim for refund (Jt. Ex. 4), and this litigation followed.

33. The sale by Davis to B. B. H., Inc. on December 6, 1963, divested Davis of all right, title and interest in, and all control over, the real estate referred to as The Bank of California Building, and was a bona fide, closed and completed transaction prior to January 1, 1964, with no conditions, restrictions or commitments of any kind between the parties to the sale, and the gain resulting therefrom was properly reported by the Plaintiffs in their 1963 Federal income tax return.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under Section 1346(a) (1), Title 28, United States Code.

2. The sale by the Plaintiff of an undivided one-half interest in The Bank of California Building in 1963 was a closed and completed transaction and the gain therefrom was properly included in Plaintiffs' 1963 income. Section 451(a), Internal Revenue Code 1954, Rev.Rul. 70–459, I.R.B. 70–36 7, and Rev.Rul. 69–93, 1969–1 C.B. 139.

3. The sale of Plaintiff's undivided one-half interest in The Bank of California Building was not a sham, but was a bona fide sale having independent economic significance and reality, and cannot be disregarded for Federal income

tax purposes merely because the Plaintiff realized a tax benefit by selling it in a year in which he incurred losses which offset the gain on the sale. Isaac S. Peebles, Jr., 5 T.C. 14 (1945); Edwards v. C. I. R., 415 F.2d 578 (U.S.C.A., 10, 1969); Clara M. Tully Trust, 1 T.C. 611 (1943); Stanley D. Beard, 4 T.C. 756 (1945); cf.: Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935); Leslie Q. Coupe, 52 T.C. 394 (1969).

4. The assessment and collection of Federal income tax and interest thereon for the year 1964 was erroneous and illegal.

Judgment will be entered in accordance with the foregoing Findings of Fact and Conclusions of Law in favor of the Plaintiffs.